UNITED STATES of America,
Appellee,

v.

Ray Allen COLLINS, Appellant.

No. 411, Docket 71–1825.

United States Court of Appeals,
Second Circuit.

Argued Jan. 5, 1972.

Decided March 7, 1972.

On Rehearing In Banc June 19, 1972.

George H. Weller, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. N. Y., and David G. Trager, Asst. U. S. Atty., on the brief), for appellee.

Michael A. Young, New York City (Robert Kasanof, The Legal Aid Society, New York City, on the brief), for appellant.

Before LUMBARD, HAYS and MANSFIELD, Circuit Judges.

LUMBARD, Circuit Judge:

Ray Allen Collins was convicted by a jury in the Eastern District of New York and sentenced to 12 years in prison for his participation in the robbery of the First National City Bank in Jamaica, Queens, on September 24, 1970, in which $55,000 was stolen and a bank guard shot.[1] He now appeals, urging that his confession made to two FBI agents should not have been introducd into evidence.[2] We hold that the confession was properly admitted after the district court had denied a motion to suppress after a pre-trial hearing. Accordingly, we affirm.

The evidence against Collins, apart from the confession, was overwhelming. Collins was tried separately from six other co-defendants. Three of his co-defendants, all participants in the robbery, testified against him. Their testimony showed that Collins, then only 19 years old, was a knowledgeable, full participant in the robbery. Collins was present at the meeting at which the initial plans were made. After this meeting, he obtained stolen license plates to use on a get-away car. During the robbery he went into the bank, armed with a carbine, was present when the guard was shot, and was one of the robbers who took the money from the tellers. Each of the three co-defendants positively identified Collins in court as well as identifying him in photographs taken by an automatic camera during the course of the robbery. Collins neither testified on his own behalf nor presented any evidence.

The robbery took place on September 24, 1970. On October 5, 1970, eleven days after the robbery, acting on an informer's tip, FBI agents and detectives from the 105th Precinct arrested Collins at 3:00 p. m. in Queens County.[3] Immediately following his arrest, he was given the *Miranda*[4] warnings: that he had a right to remain silent, that anything he said could be used against him, that he had a right to an attorney and one would be provided him if he were indigent, and that he had the right to terminate any questioning at any time by indicating that he did not desire to answer further questions. Collins was then transported to the 105th Precinct for processing, arriving there at approximately 3:25 p. m. For the next 35 minutes, Collins claimed that he was one

---

1. Collins was convicted of violations of 18 U.S.C. § 2113(a) (armed bank robbery) and 18 U.S.C. § 2113(d) (assault with a dangerous weapon in the course of a bank robbery) and given concurrent 12-year sentences.

2. Collins also contends that the trial judge erroneously failed to instruct the jury that his confession had to be proved volun-

tary beyond a reasonable doubt. This contention has no merit. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed. 2d 618 (1971).

3. No challenge has been made as to the propriety of the arrest.

4. Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

James Taylor, but, at 4:00 p. m., he acknowledged that he was Ray Allen Collins.

Having acknowledged his identity, Collins was again given the *Miranda* warnings, including his right to terminate the interview at any time, and then was asked whether he had had any connection with the bank robbery. Collins replied that "bank robbery was not his stick and that he had had nothing to do with the robberies." No further questions followed. FBI Agent Maheffy testified, "We let him go and sit by himself for the most part . . . when he said it wasn't his stick, he knew nothing about bank robbery, and he didn't want to talk about it."

From 4:00 p. m. until 6:30 p. m., Collins remained in the 105th Precinct where he was routinely processed by the police who had participated in the arrest. No additional interrogation was attempted. Around 6:30 p. m., Collins was transferred by automobile to the FBI's Manhattan headquarters so that he could be processed by the FBI.

The trip from the 105th Precinct to FBI headquarters in Manhattan took from 6:30 p. m. until approximately 8:45 p. m. because of the heavy Monday traffic. It is uncontested that, during the ride, Collins was not interrogated.

On his arrival at FBI headquarters Collins was again given the *Miranda* warnings, again including his right to terminate interrogation at any time. FBI Agent Landolfi asked Collins certain routine questions as to his age, weight, and condition of health. During this questioning, Collins admitted he was a narcotics user. At the end of the interview, Landolfi finally asked Collins about the bank robbery. Collins answered that he knew there had been "a bank robbery, but he had no knowledge of anyone who had committed the bank robbery." Collins' negative response terminated the questioning. From the time Collins was given the *Miranda* warnings until he had given his final answer, approximately eight minutes elapsed.

Further processing—taking Collins' handprints and photographs—took another 90 minutes, the lapse of time due partly to the fact that a technician had to be called in to put the photography lab, which had been closed for the night, into working order and partly because of the length—45 minutes—of the handprinting procedure. Again, it is uncontested that no questioning took place during this period. Finally, at 10:30 p. m., Collins was transferred to the Federal House of Detention in Manhattan, there receiving, at 11:00 p. m., a narcotic substitute to forestall any possible ill effects caused by his forced withdrawal from heroin.

At 10:00 a. m. the next morning, FBI Agents Neville and Hardin took Collins by car from the Manhattan House of Detention to the United States Attorney's Office in the Federal Courthouse in Brooklyn. The trip took one hour. At the beginning of the ride, Agent Hardin advised Collins of his *Miranda* rights including his right to halt any interrogation at any time. He then asked Collins if he would like to discuss the bank robbery. Collins responded negatively and, during the remainder of the ride, neither agent attempted to interview him.

On arriving at the United States Courthouse, Neville and Hardin proceeded, with Collins, to Assistant United States Attorney Puccio's office to process the papers necessary to arraignment. Hardin and Neville kept Collins with them because, until after arraignment, he was charged to their custody. Puccio, who was involved in court proceedings that morning, was not in his office when Hardin, Neville and Collins arrived there at approximately 11:00 a. m.

Agent Hardin testified that he felt "in view of the circumstances [of the case], we felt . . . one last try" at a confession was warranted. Asked to explain "the circumstances," Hardin indicated that most of the robbers were still at large and "we were interested in stopping more killings, more bloodshed and more bank robberies, and we felt that he

might be able to help us and we would appreciate his cooperation."

Collins was then advised of his *Miranda* rights, again including his right to discontinue the interview at any time. After listening to a few questions, Collins again indicated that he did not wish to discuss the case. Hardin then ceased questioning Collins, but appealed to him to assist the FBI in catching the members of the gang still at large. Hardin testified, "We told him we feel there is a strong possibility that he may have something to do with it and that we needed— would like for him to help us or assist us in identifying these people." Collins made no response to Hardin's appeal. When Puccio returned to his office at approximately 11:30 a. m., he gave Collins the *Miranda* warnings, asked Collins if he wished to make a statement and receiving no answer asked the agents if Collins had made a statement and was told that he had not. Hardin and Neville, with Collins still present, then began to discuss the case with Puccio in preparation for the arraignment, apparently occasionally addressing Collins. At approximately 11:50 a. m., Collins was again asked if he wanted to make a statement. He then confessed his participation in the robbery and described the robbery and the other participants in full detail.

Once Collins made his initial confession, five more hours were spent in having him identify the other robbers from photographs and in obtaining information on future bank robberies planned by the gang. At 5:45 p. m. Collins was arraigned. At arraignment, he was represented by counsel.

Collins now claims that his confession should not have been admitted into evidence since some 21 hours had elapsed between his arrest and his confession and 26 hours between his arrest and his arraignment. Basing his argument on Rule 5(a), F.R.Crim.P., and the line of cases beginning with McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and culminating in Mallory v. United States, 354 U.S. 449,

77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), which prohibit unnecessary delay prior to arraignment, he argues that the time elapsed prior to his arraignment was unnecessary and rendered his confession inadmissible. We disagree.

■ Even assuming the applicability of the *McNabb-Mallory* standard, *but see* 18 U.S.C. § 3501, the delay prior to Collins' arraignment was not "unnecessary." Arrested at 3:00 p. m., 25 minutes was spent in transporting him to the local stationhouse and 35 minutes in establishing his identity. Routine processing occupied the next 2½ hours during which only a single question was asked. Owing to the complexities of federal-state cooperation, he then had to be transferred to FBI headquarters for further processing, the trip itself taking two hours and the processing another two. During this four-hour period, he was questioned only once for approximately eight minutes. He then was placed in the House of Detention for overnight incarceration. The next morning he was taken to the United States Attorney's Office in Brooklyn, the trip taking one hour. Waiting for the Assistant United States Attorney took approximately ½ hour and supplying him with the information necessary for arraignment took approximately 15 minutes. Collins then confessed and the next 5½ hours were spent in particularizing the confession.

Under our view of the case none of the time prior to Collins' confession and arraignment was "unnecessary" within the meaning of the *McNabb-Mallory* rule. We have consistently held that delays for purposes of routine processing—here a total of 3 hours and 15 minutes spent at the 105th Precinct, FBI headquarters and Assistant United States Attorney Puccio's office—or for overnight lodging —here the 11½ hours in the Manhattan House of Detention—do not constitute unnecessary delay within the *McNabb-Mallory* rule. *E. g.*, United States v. Price, 345 F.2d 256 (2d Cir.), cert. denied, 382 U.S. 949, 86 S.Ct. 404, 15 L.Ed.2d 357 (1965); United States v. Middleton, 344 F.2d 78, 82 (2d Cir. 1965).

Of the remaining 9½ hours, 3½ hours, the time spent in transit, was clearly necessary to move Collins through the complexities of the combined federal-state system, ½ hour was necessary to establish his identity and 5½ hours were consumed in particularizing a voluntarily given confession. No part of these detention periods was unnecessary. The conduct of the FBI and the New York City Police Department was at all times directed to processing Collins as expeditiously as possible for arraignment.

Moreover, the present viability of the *McNabb-Mallory* rule is open to serious question. See United States v. Marrero, 450 F.2d 373 (2d Cir. 1971). Congress has recently enacted statutory rules governing the admissibility of a confession in a federal criminal proceeding. 18 U.S.C. § 3501(a) provides that all voluntary confessions are admissible and 18 U.S.C. § 3501(b) provides that in determining the voluntariness of a confession "the time elapsing between arrest and arraignment" is only one factor to be considered. Taken together, the two provisions seem to have modified the *McNabb-Mallory* rule that unnecessary delay in arraignment is sufficient in and of itself to require exclusion of a confession. Rather the Congressional test would seem to be the voluntariness of a confession under all the circumstances.[5] Here, as the circumstances of the delay were noncoercive and during it Collins was not subjected to harassing interrogation, we hold that the delay in no way affected the voluntariness of the confession.

■ Collins contends, however, that the delay combined with his youth, his use of drugs, and the initial absence of counsel, to make his confession involuntary. See, *e. g.*, Townsend v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); Reck v. Pate, 367 U.S. 433, 81 S. Ct. 1541, 6 L.Ed.2d 948 (1961); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1940). We disagree. In our view, nothing in the record supports Collins' contention that the confession was involuntarily made. Though Collins was only 19, no stratagems were used to take advantage of any possible youthful ignorance or naivete. Similarly, though he was a drug addict, a narcotic substitute was given him to forestall possible discomfiture as a result of his forced abstinence from heroin. Moreover, prior to his confession, Collins was subject neither to intimidating police conduct nor to mistreatment of any sort. He was only sporadically questioned and on each occasion advised of his rights. In short, his confession was voluntary.

■ Collins' last argument assumes that his confession was voluntary, but argues its inadmissibility under *Miranda* because of the "refusal of the agents to terminate their interrogation of appellant, despite his repeated requests that they do so." The record does not show that the agents ignored any request of Collins.

We recognize that in *Miranda* the Court said that the police may not ignore a defendant's stated wish to have any interrogation cease. Miranda v. Arizona, *supra*, 384 U.S. at 473–474, 86 S.Ct. at 1627.[6] But here all the government agents who had custody of Collins recog-

---

5. We do not decide whether § 3501 intended to overrule Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or would be constitutional if it did.

6. "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (Footnote omitted.) Miranda v. Arizona, 384 U.S. at 473–474, 86 S.Ct. at 1627.

nized their obligation under *Miranda* and advised him of his right to halt any questioning. Never was Collins questioned, nor in any way addressed, without being expressly told that the questioning would ceased if he so desired. On three occasions prior to his confession, Collins had seen that this was true. On Monday, at 4:00 p. m., interrogation had ceased after a single question when Collins said that he had not been involved in the bank robbery. At 8:45 p. m. that same evening, interrogation had immediately ceased when Collins said he didn't wish to discuss the case. On Tuesday, at 10:00 a. m., while in transit, Collins' wish not to discuss the case was again respected. After these three occasions, it must have been clear to Collins that he was neither faced with badgering from relentless interrogators nor that his immediate well-being depended on his submission to a menacing captor's demands. Quite the contrary was true; he was considerately treated throughout.

Against this background, Agent Hardin's plea that Collins confess to prevent "more killings, more bloodshed, and more bank robberies" amounted to no more than an exhortation that Collins reevaluate his decision not to talk. We do not believe that anything decided in *Miranda* was meant to prohibit police officers from ever asking a defendant to reconsider his refusal to answer questions. So to hold would be tantamount to enacting a "no questioning" rule once a suspect was in custody. Such a rule finds no support in the Fifth Amendment nor, fairly read, in *Miranda* itself, nor in common sense.

■ The circumstances of this case differ substantially from those in United States v. Crisp, 435 F.2d 354 (7th Cir. 1970), cert. denied 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971) or United States v. Priest, 409 F.2d 491 (5th Cir. 1969). In those cases, the defendant was subjected to intensive questioning immediately following a refusal to answer. Here Collins was not subjected to any immediate re-interrogation, but only was asked to reconsider his refusal to answer. So long as such reconsideration is urged in a careful, noncoercive manner at not too great length and in the context that a defendant's assertion of his right not to speak will be honored, it does not violate the *Miranda* mandate. In the circumstances of this case, even if Collins' confession were in response to Agent Hardin's request, it was not made involuntarily.

The record makes clear, however, that there was a substantial gap between Agent Hardin's request and the confession. Once Assistant United States Attorney Puccio arrived in the office, the further conversation was directed not toward Collins, but toward preparing the complaint. Collins' confession followed a period of time in which no statements were addressed to him and during which there was clearly no coercive behavior by either FBI agents or by the Assistant United States Attorney. The waiver of his rights was knowing and intelligent; the confession was voluntary and it was properly admitted into evidence.

Affirmed.

MANSFIELD, Circuit Judge (dissenting):

I must dissent for the reason that in my view Collins' conviction was obtained through use of an oral confession secured from him in violation of constitutional safeguards specifically prescribed by the Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

If the sole issues on this appeal were the delay in arraignment of Collins and the voluntariness in fact of his oral confession, I would abide by the trial court's exercise of discretion. Even as to these issues, however, the questions presented are much closer than the majority indicates. In this case a 19-year old addict was arrested in Queens County, New York, at 3:00 P. M. on October 5, 1970, and taken to a local New York City precinct station where he was processed and an unsuccessful attempt was made to interrogate him. He was held there

from 3:25 P. M. until 6:30 P. M. instead of being brought directly to the United States Courthouse in Brooklyn for arraignment [1] and then taken to the FBI Headquarters in Manhattan, the trip from Queens requiring approximately two hours instead of the usual half-hour to one hour. There he was again "processed" until 10:30 P. M., another effort to interrogate him was unsuccessful, and by 11:00 P. M. he was lodged at the Federal House of Detention in Manhattan, where methadone was administered.

Some time between 10:00 and 10:30 A. M. on the following morning two FBI agents drove him from the Federal House of Detention to the United States Courthouse in Brooklyn. During the course of the trip they made another unsuccessful attempt to interrogate him. Arriving at the courthouse they did not bring him immediately to the United States Magistrate's office for arraignment, but took a detour via the United States Attorney's office where one more unsuccessful effort at interrogation was made. Finally, when the interrogation was taken over by an Assistant United States Attorney, Collins broke down at 11:45 A. M. and confessed. The confession was obtained 20 hours after his arrest, after he had on three occasions asserted his constitutional right to remain silent, and without the benefit of his having legal counsel. It seems to me that the totality of circumstances (his age, lack of counsel, addiction, assertion of his right to remain silent, and the 20 hours without arraignment between his arrest and confession) posed a strong potential for compulsion which might have warranted the rejection of his statements according to the standards set forth in Title II of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 3501.[2] However, since the weight to be extended to some of these factors turns on credibility, I would not disturb Judge Bartels' findings as to voluntariness.

Even accepting the trial judge's findings that Collins' confession was voluntary, however, the Supreme Court's decision in *Miranda* mandates its exclusion on constitutional grounds. In that historic decision the Court prescribed specific procedural safeguards to be followed by law enforcement officials in the conduct of in-custody interrogation and prohibited the government from introducing into evidence as part of its case any statement obtained in violation of these procedures, regardless of its voluntariness in a particular case. After outlining the warnings that must be given and the steps that must be taken with respect to a suspect held in custody before lawful interrogation might proceed the Court stated:

"We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains *inherently compelling pressures* which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and *the exercise of those rights*

1. If he had been under 18 years of age, immediate arraignment would have been required by the Federal Youth Corrections Act, 18 U.S.C. § 5035, and the statement obtained from him some 20 hours after his arrest would probably have been excluded, see United States v. Glover, 372 F.2d 43 (2d Cir. 1967) ; United States v. Binet, 442 F.2d 296, 302 (2d Cir. 1971).

2. I concur in the view that this statute modifies the *McNabb-Mallory* doctrine (McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) ; Mal-

lory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957)) to the extent of authorizing a district court, notwithstanding delay in arraigning a defendant, to admit a statement given by him upon finding, after consideration of the totality of the circumstances (including the delay), that it was voluntarily given. See United States v. Marrero, 450 F.2d 373 (2d Cir. 1971) ; United States v. Halbert, 436 F.2d 1226 (9th Cir. 1970) ; Grooms v. United States, 429 F.2d 839 (8th Cir. 1970).

*must be fully honored.* (Emphasis supplied)

\* \* \* \* \* \*

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege *cannot be other than the product of compulsion,* subtle or otherwise." (Emphasis supplied) 384 U.S. 436, 467, 473–474, 86 S.Ct. 1602, 1624.

The foregoing procedures represent the law of the land. The record here makes it clear that they were disregarded by the government interrogators. When the FBI agents, immediately after arresting Collins and giving him the warning prescribed by *Miranda,* first attempted to interrogate him about the bank robbery he advised them that "he didn't want to talk about it [the bank robbery]" (Testimony of FBI Agent Mahaffey). Strict and literal application of the Supreme Court's directions in *Miranda* would have required the government thereafter to cease efforts to interrogate Collins, at least until he was represented by counsel.[3] But even if it be assumed that Collins' initial claim of privilege on October 5th did not preclude further attempts to interrogate him on the following day, the record is clear that the crucial statement finally given by him on October 6th at 11:45 A. M. to the Assistant United States Attorney was obtained as the result of persistent efforts to interrogate him after he had stated on two occasions within a short period on the morning of October 6th that he did not want to discuss the bank robbery or

to make a statement. More specifically, after he was picked up by FBI Agents Hardin and Neville at the Federal House of Detention between 10:00 A. M. and 10:30 A. M. and, following *Miranda* warnings, they attempted to interrogate him, he stated that he didn't want to discuss the matter (Testimony of Agent Hardin), and "that he did not want to make a statement" (Testimony of Agent Neville). When, shortly after they arrived at the courthouse at approximately 11:00 A. M., the agents again gave him *Miranda* warnings in the office of the Assistant United States Attorney and again attempted to interrogate him, Collins once more stated that he did not want to talk about the bank robbery. The situation at approximately 11:15 to 11:30 A. M. on October 6th was summed up by Agent Neville as follows:

"Q. So he [Collins] had told you in the automobile he didn't want to talk about [the bank robbery] and he told you again in Mr. Puccio's office that he didn't want to talk about it?

\* \* \* \* \* \*

"A. Yes, sir."

With commendable candor FBI Agent Hardin conceded that the agents were using the period during which they waited for the arrival of the Assistant United States Attorney in an effort to obtain a statement from Collins. In furtherance of this objective, the agents talked about the robbery between themselves, obviously hoping that their conversation would influence Collins. They told Collins that "there is a strong possibility that he may have something to do with it [the robbery]," that they were appealing to his better nature in order to stop bloodshed and that a "reliable" informer had pegged him as one of the robbers. With the stage thus set, Assistant United States Attorney Puccio ar-

---

3. The Supreme Court did indicate that where a suspect has an attorney present "there may be some circumstances in which further questioning would be permissible," 384 U.S. at 474 n. 44, 86 S.Ct. at 1627. Collins contends that he telephoned his mother on the night of October 5th and asked her to get him a law-

yer but the government replies that as far as it knows he did not make the phone call until between 1:00 and 2:00 P.M. on the next day, after he had started his confession. He was represented by counsel when he was finally arraigned at 5:45 P.M. on October 6th.

**800**

rived. Once more *Miranda* warnings were given to Collins, this time by Puccio, details of the government's case against him were outlined by the FBI agents to Puccio in Collins' presence, and then the Assistant United States Attorney sought to induce Collins to talk. Against this background it is not surprising to find that after initially refusing to talk, Collins, a 19-year old addict, broke down within 15 minutes and admitted his involvement in the robbery. The next five hours were spent by the agents in getting details, including information with respect to others involved in the robbery.[4]

I find it difficult to conceive of a clearer violation of the plain and unequivocal proscription laid down by the Supreme Court in *Miranda* than that revealed by the record here. Despite the fact that Collins had on three occasions asserted his constitutional right to remain silent, two of them within a period of approximately one hour before he finally began talking, repeated efforts were made to interrogate him by those who held him continuously in their custody. Under such circumstances a waiver of the right to remain silent should not be inferred.[5]

The necessity for rejecting statements obtained under similar circumstances as the result of custodial interrogation has been recognized by other circuits. See, e. g., United States v. Crisp, 435 F.2d 354, 357 (7th Cir. 1970); United States v. Priest, 409 F.2d 491, 493 (5th Cir. 1969); United States v. Slaughter, 366 F.2d 833, 841 (4th Cir. 1966) (*en banc*). I find no basis for the majority's attempt to distinguish the decision in *Crisp* and *Priest* on the ground that the defendants there were subjected to "intensive questioning immediately following a refusal to answer." Neither court

---

4. Although the majority does not discuss the question, its statement (page 793) that the evidence against Collins "was overwhelming" suggests that admission of Collins' statement, if erroneous, was "harmless beyond a reasonable doubt," see Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Although there is authority supporting the view that admission of an unlawfully obtained confession requires automatic reversal, Payne v. Arkansas, 356 U.S. 560, 567–568, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); People v. Schader, 62 Cal.2d 716, 730–731, 44 Cal.Rptr. 193, 401 P.2d 665, 673–674 (1965), in any event, it is difficult to see how admission of Collins' confession would constitute harmless error, since it was the source of the "overwhelming evidence" against him. Before Collins confessed, the Government did not know the identity of the other bank robbers. Collins furnished them with the first names of some of the others, a description of the get-away car, and other information which enabled the government to apprehend the defendants. It was the testimony of the co-defendants thus apprehended that constituted the "overwhelming evidence" against Collins.

5. See, e. g., the American Law Institute's Model Code of Pre-Arraignment Procedure (Study Draft No. 1, 1968) § A5.08(2) (e), drafted after *Miranda*, which states:

"No waiver shall be sought from an arrested person after any time that he has indicated in any manner that he does not wish to be questioned or that he wishes to consult counsel before submitting to questioning. [No statement made by an arrested person after any time that he has indicated in any manner that he does not wish to be questioned or that he wishes to consult counsel before submitting to questioning, unless it is made in the presence of or upon consultation with counsel, shall be admitted into evidence against such person in a criminal proceeding in which he is the defendant.]"

The Notes on subsection (e) state that: "As the investigation of the case develops, it may be quite natural for the police to inquire of an arrested person whether he wishes to change his mind and make a statement or submit to questioning, and there may be cases where such a change of mind can occur without any semblance of coercion. On the other hand, even a voluntary-seeming waiver given after a person has once indicated he does not wish to cooperate may be the product of subtle coercion; the very passage of time while a person continues to be in police detention will create fears and pressures undermining the will to insist on one's right to silence and right to counsel."

placed its decision on any such ground.[6] Indeed, the Supreme Court has indicated that a statement taken in violation of the protections provided in *Miranda* must be summarily excluded. Questions of the circumstances of its taking, such as whether or not subsequent questioning was "intensive," are relevant only in applying the Due Process standard of voluntariness which prevailed before *Miranda*, Davis v. North Carolina, 384 U.S. 737, 739–740, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), and that standard does not apply here.

We are not here confronted with a change of circumstances or a situation where a suspect, some hours or more after interrogation has ceased, voluntarily waives his right to remain silent and initiates a statement. See, *e. g.*, United States v. Crisp, 435 F.2d 354, 357 (7th Cir. 1970); State v. Godfrey, 182 Neb. 451, 155 N.W.2d 438, cert. denied, 392 U.S. 937, 88 S.Ct. 2309, 20 L.Ed.2d 1396 (1968).

The effect of the majority's decision is to overrule *sub silentio* the precise mandate laid down by the Supreme Court in *Miranda*. A substantial segment of the federal judiciary may justifiably believe that the Supreme Court went too far in that decision and that the specificity of the procedural safeguards prescribed by it has had the effect of creating an un-

necessary straitjacket that should be loosened to permit use of a custodial statement voluntarily given, even though the interrogators have failed to touch all of the bases prescribed by the Supreme Court in *Miranda*. But any modification of *Miranda* must come from the Supreme Court, see, *e. g.*, Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L. Ed.2d 1 (1971), or by constitutional amendment. Until then we are bound by that decision.

## ON REHEARING IN BANC

Before FRIENDLY, Chief Judge, and LUMBARD, KAUFMAN, HAYS, FEINBERG, MANSFIELD, MULLIGAN, OAKES and TIMBERS, Circuit Judges.

### PER CURIAM:

■ We ordered rehearing in banc to resolve what appeared to be a difference of view whether a sentence in the majority opinion in Miranda v. Arizona, 384 U.S. 436, 473–474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966), "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease," required that interrogation must cease forever (save for the instance mentioned in fn. 44), or whether *Miranda* allowed renewal in proper circumstances. As a result of study of the addi-

---

6. In *Crisp* the Seventh Circuit stated:
    "Both the letter and spirit of the Supreme Court's decision in *Miranda* call for condemnation of *even this seemingly innocuous police conduct*. The procedural safeguards imposed in that case were premised upon the observation that custodial interrogation in the absence of defense counsel is inherently intimidating and destructive of free enjoyment of the constitutional privilege against self-incrimination. To be effective, those safeguards must be fully observed, and the rights of the suspect must be jealously guarded. *Not even the slightest circumvention or avoidance may be tolerated*. The rule that interrogation must cease, in whole or in part, in accordance with the expressed wishes of the

suspect means just that and nothing less. *Once the privilege has been asserted, therefore, an interrogator must not be permitted to seek its retraction, total or otherwise*. Nor may he effectively disregard the privilege by unreasonably narrowing its intended scope." (Emphasis supplied.) 435 F.2d 354, 357. In *Priest* the Fifth Circuit also recognizes that *Miranda* is absolute, stating:
    "Situations to which *Miranda* applies . . . are governed not by the general test of voluntariness but rather by the more precise test of whether the constitutionally required warning was given and, if given, whether the rights set out by that warning were knowingly, intelligently, and voluntarily waived." 409 F.2d 491, 493.

tional briefs submitted by the parties and further discussion, we are agreed that what *Miranda* requires is that "interrogation must cease" until new and adequate warnings have been given and there is a reasonable basis for inferring that the suspect has voluntarily changed his mind.

■ While there remains a difference of opinion among us whether that test was met here, we would not have directed rehearing in banc merely to resolve a question of fact in a particular case. The considerations against doing this are of special force in this case, since, due to the fact that the points stressed at the suppression hearing were delay in arraignment and involuntariness in the traditional sense, we lack the benefit of findings by the district judge on the factual question now at issue. Indeed the *Miranda* point was raised only tangentially even in the briefs to the panel in this court.

We therefore vacate the order for rehearing in banc as improvidently granted. Although the statute, 28 U.S.C. § 46(c), makes clear that Senior Judge Lumbard, a member of the panel, is "competent to sit" on the in banc court, we are uncertain whether he can participate in a decision to revoke in banc consideration, as he clearly would not have been entitled to vote for or against it. While he approves the action here taken, his vote is not required for the result; he has consequently abstained from participating in the decision.

MANSFIELD, Circuit Judge (concurring):

I concur in the result.

OAKES, Circuit Judge (concurring):

I concur in the result.