**UNITED STATES of America,**
**Appellee,**

v.

**Alphonse JOHNSON et al., Defendants-**
**Appellants.**

**Nos. 882, 887 and 893, Dockets 72–1308,**
**72–1309 and 72–1449.**

United States Court of Appeals,
Second Circuit.

Argued June 29, 1972.

Decided Aug. 11, 1972.

Gerald E. Farrell, Wallingford, Conn., for appellant Alphonse Johnson.

James C. Whitney, New Haven, Conn. (Sosnoff, Cooper & Whitney, New Haven, Conn.), for appellant Rufus Higley.

Robert C. Mirto, West Haven, Conn., for appellant David White.

Thomas F. Maxwell, Jr., Asst. U. S. Atty., New Haven, Conn. (Stewart H. Jones, U. S. Atty., D. Conn., New Haven, Conn.), for appellee.

Before MOORE, SMITH and TIMBERS, Circuit Judges.

MOORE, Circuit Judge.

Alphonse Johnson, Rufus Higley and David White appeal from judgments of conviction entered after a jury trial in the District of Connecticut. Appellants were each charged with having conspired to rob a bank and with having robbed a bank in violation of 18 U.S.C. §§ 2113(a), (b),(d); 2 and 371, and with having possessed an unregistered firearm in violation of 26 U.S.C. §§ 5861 and 5871. At trial, after the Government rested, the conspiracy count and the count charging Alphonse Johnson with possession of an unregistered firearm were withdrawn. Before the case was submitted to the jury, the count charging Rufus Higley with possession of an unregistered firearm was dismissed. The jury returned verdicts of guilty on the remaining counts.

In their appeals, appellants have asked us to consider a total of six alleged trial court errors which they claim require reversals of their respective judgments of conviction. Alphonse Johnson claims that his confession to an F.B.I. Agent should have been suppressed because it was the result of an unnecessary delay in presenting him before a magistrate. Alternatively, he contends that he was not adequately warned of his rights. Lastly, he asserts that he was entitled to the presence of an attorney at a pre-trial photographic identification. Rufus Higley claims that the trial court erred in admitting items of

evidence seized without a warrant at his residence at the time of his arrest. Both Rufus Higley and David White challenge the admissibility of a suitcase and its contents found near the back door of an apartment house shortly after David White was arrested in one of the apartments. David White also claims that the trial court erred in failing to order the disclosure of the identity of the informant who told the police where the suitcase could be found. As answers to these contentions rest on an analysis of the evidence presented at the trial and the suppression hearing, a somewhat detailed exposition of this evidence is required.

## I.

At approximately. 1:20 P.M. on March 24, 1971, three black males with stocking caps over their heads entered the Dixwell Plaza Branch of the New Haven Savings Bank. Two carried weapons, including a sawed-off shotgun, and ordered those present not to move. The third removed approximately $4,300 from the teller's drawers including "bait" money (currency which can be easily traced). As the three exited, Mr. Spence, the bank manager, set off an alarm to notify the New Haven Police Department.

In response to the alarm, police officers promptly appeared at the bank. They questioned the bank employees and discovered that moments before the robbery three black males entered the bank and quickly left. According to those questioned, those three robbed the bank. The police were therefore able to obtain descriptions of the robbers. Within minutes, police officers on foot and in patrol cars were searching for the robbers in the streets surrounding the bank.

In a school yard near the bank, Detective Granger, in the company of other police officers, discovered a trail of blood. On foot, they followed the trail to 162 Ashmun Street, a residence located approximately 1,350 feet from the bank. As the officers approached the

residence, they met Detective Buffalo and other officers at the front door.

Detective Buffalo had been in a patrol car searching for the armed robbers when he received a report that there was a request for an ambulance at 162 Ashmun Street. It was this report that caused the convergence of the police officers at that address, Rufus Higley's residence.

With guns drawn, the officers entered the residence and discovered Rufus Higley lying on the kitchen floor suffering from a shotgun wound in his leg. Another black male, Chester Bordeaux, was standing near him. Both were placed under arrest.

Knowing that a shotgun, among other weapons, had been used in the robbery, that one robbery suspect was already wounded, that no weapons had as yet been discovered and that there were at least three robbers, Detective Buffalo and four other officers, with their guns drawn, proceeded to search the upstairs bedrooms. While searching the first bedroom, Detective Buffalo opened a closet and noticed a "grip" protruding from a bag which was lying on the closet shelf. As the "grip" appeared to be similar to one that might be part of a weapon, the bag was opened. The "grip" proved to be the blue handle of a hacksaw. In addition, a block of wood from a sawed-off shotgun was in the bag. After the contents of the bag were examined, Detective Buffalo noticed a black cashmere coat in the closet which he had seen Higley wearing on numerous occasions. He searched the pockets of the coat and found a shotgun shell. No other articles of clothing were searched. Then, having satisfied themselves that this first bedroom was secure, the officers proceeded to search another upstairs bedroom and bathroom. Nothing suspicious was found in these rooms.

Subsequently, Higley and Bordeaux were taken from the house; Higley to a hospital and Bordeaux to police headquarters. At police headquarters, Bor-

deaux was questioned as to his possible involvement in the bank robbery. During the course of this interview the police learned that moments after the robbery Bordeaux observed Higley (whom he knew well) leaning over a fence. As Bordeaux approached Higley, he noticed that Higley's leg was covered with blood. Bordeaux then assisted him to the back door of the Higley residence and left. Upon returning a few minutes later, he observed Johnson and White leaving the Higley residence together. When he entered the house, Higley asked him to call an ambulance. The police arrived as they waited for the arrival of the ambulance. Armed with this information, the police concluded that Bordeaux was probably not involved in the robbery and that their investigation should focus upon locating Johnson and White.

Several days later, on March 31 at approximately 9:00 A.M., Johnson was arrested on a federal warrant in Paterson, New Jersey, by detectives from the Paterson Police Department. Upon arrest, he was advised of the charges against him and warned of his constitutional rights.[1] Minutes later, at the Paterson Police Station, he read these same rights aloud from a poster on a wall and stated that he understood each one of them. Then an inventory of his possessions was made. During the course of this inventory Johnson removed currency from his pockets which proved to be part of the "bait" money. Shortly thereafter, Johnson orally admitted his participation in the bank robbery.

After Johnson's arrest, the F.B.I. was notified that the warrant had been executed. Between 12:00 and 1:00 P.M., F.B.I. Agents arrived at the Paterson Police Station. The appropriate forms were completed and Johnson was placed in the custody of the Agents. After the

transfer, Agent Lyons orally warned Johnson of his constitutional rights and then presented him with a Waiver of Rights Form which he signed. Then, between 2:18 and 3:18 P.M., Johnson was interviewed by Agent Lyons and again he confessed. Throughout these proceedings, Johnson was generally cooperative and gave no indication that he wished to terminate the questioning. At approximately 3:55 P.M. Johnson was presented before a magistrate in Newark, New Jersey.

The following day a reliable informant notified the Paterson police of David White's whereabouts. At approximately 9:45 A.M. White was arrested in an apartment at 221a Van Houten Street in Paterson. He was taken to the police station where he was questioned as to his possible involvement in the robbery. During this interview, the informant again telephoned to advise the police that two suitcases belonging to White could be found outside the building at 221a Van Houten Street near the rear door. The informant also advised the police that one suitcase contained a shotgun. Knowing that the building was located in a transient and high crime area and that the suitcases were possibly visible to passers-by, the police, without a warrant, rushed to the building and discovered the suitcases. Upon immediate examination, one suitcase was found to contain a loaded sawed-off shotgun.

With the three suspects in custody, the police proceeded with their investigation of the bank robbery. They discovered that Sanders Boomer, David White's step-father, owned two shotguns and a pistol and that these items, in addition to a blue handled hacksaw were removed from his home in the course of burglary on March 22, 1971. According to Boomer, his step-son knew of the ex-

---

1. He was warned:

"You have the right to remain silent, anything you say can and will be used against you in a court of law. You have a right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to have a lawyer, one will be appointed for you to represent you before any questioning if you wish." (Trial Transcript, p. 311)

Each time he was warned of his rights, virtually identical language was used.

istence of the weapons. Upon examination of pertinent Government records, no shotguns were found to be registered to David White. The police also discovered that for two days prior to the robbery Higley, Johnson and White had been meeting at the Higley residence. Lastly, it was learned that White, in the company of Johnson, made several substantial purchases of clothes a few days after the robbery.

In due course, the above evidence was presented to a jury. It is clear that the jury was amply justified in returning verdicts of guilty. Appellants, individually and jointly, claim that certain information was improperly withheld from them and that other evidence should not have been considered by the jury. It is to these claims that we now turn.

## II.

Johnson's primary contention is that his confession to F.B.I. Agent Lyons was the product of an "unnecessary delay" in being presented before a magistrate and hence, should have been suppressed. We disagree; the delay, whether measured by the *McNabb-Mallory* rule,[2] as appellant urges us to do, or by the standards prescribed in Title II of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 3501,[3] was permissible.

---

2. Rule 5(a) of the F.R.Cr.P. requires that "[a]n officer making an arrest under a warrant . . . shall take the arrested person without unnecessary delay before the nearest available commissioner. . . ." Evidence secured in violation of this Rule is inadmissible in a federal criminal proceeding. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L. Ed. 819 (1943); Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

3. 18 U.S.C. § 3501 provides:

(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or which he was suspected at the time of making the confession, (3)

whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

(c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such persons before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of

With respect to the cases cited by the appellant in which the *McNabb-Mallory* rule is delineated and those additional cases which research has disclosed, even assuming their applicability in light of 18 U.S.C. § 3501, we find no authority for holding the delay here at issue "unnecessary." As these cases indicate, the determination of whether there has been an "unnecessary delay" in presenting a suspect before a magistrate does not rest solely upon a calculation of the hours and minutes which elapse between an arrest and the arraignment. In each of these cases, the focal question is not how much time passed but how the time was used. *See, e. g.,* United States v. Marrero, 450 F.2d 373 (2d Cir. 1971), cert. denied, 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972); *see,* C. Wright, Federal Practice and Procedure, § 74 at 85 (1969). An analysis of the use of time in the instant case establishes that there was no "unnecessary delay."

Johnson was arrested by state police officers at approximately 9:00 A.M. By 3:55 P.M. the same day arraignment proceedings had already begun. During the intervening 6 hours and 55 minutes, 45 minutes were spent travelling from the place of arrest to the police station and from the police station to the magistrate. As Johnson was not questioned during this span of time, it is evident that it cannot be termed unnecessary.[4] An additional 2 hours and 45 minutes were spent in routine processing, the "booking" procedures and the transfer of Johnson from state to federal custody. As this routine processing is unavoidable, the time spent cannot be considered unnecessary. Similarly unquestionable are the 45 minutes which passed while Johnson ate his breakfast. Finally, Johnson was interviewed by state police officers for 1 hour and 40 minutes and by federal officers for 1 hour. During these interviews the authorities obtained essential information on Johnson's pedigree and Johnson twice voluntarily confessed.[5] As the confession was first given to the state authorities shortly after that interview began and was similarly repeated to the federal agents, much of the interviewing time was spent particularizing the confession. Thus, even assuming that we must consider the period of state custody in determining whether there was an "unnecessary delay", *see,* United States v. Coppola, 281 F.2d 340 (2d Cir. 1960), aff'd per curiam, 365 U.S. 762, 81 S.Ct. 884, 6 L. Ed.2d 79 (1961); United States v. Chadwick, 415 F.2d 167 (10th Cir. 1969), the time spent interviewing Johnson cannot be considered as giving rise to a violation of the *McNabb-Mallory* rule. *See,* United States v. Collins, 462 F.2d 792 (2d Cir. 1972), order for rehearing in banc vacated per curiam, 462 F.2d 801 (2d Cir. 1972); *Marrero, supra.* It follows that no period of the detention constituted an "unnecessary delay" within the meaning of the rule.

A similar conclusion is reached through application of the now controlling standards set out in 18 U.S.C. § 3501.[6] Section 3501(c) prohibits ruling

---

transportation and the distance to be traveled to the nearest available such magistrate or other officer.

(d) Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention.

(e) As used in this section, the term "confession" means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.

4. See, 18 U.S.C. § 3501(c).

5. Johnson does not claim that his confession was the result of coercion, either physical or psychological, or that it was any other way involuntary. See 18 U.S. C. § 3501(b).

6. The difficult question of whether section 3501 was intended to overrule Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or whether it would be constitutional if it was, is not presently before us and we express no opinion as to the possible answers.

a confession inadmissible solely because of delay in bringing a suspect before a magistrate if the confession was made within six hours of arrest plus such additional period as is found to be reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate. To determine whether these limits have been exceeded, the period to be calculated is the time "while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency. . . ." In doubt is the question of whether Congress intended that both state and federal custody be included in this calculation. See, Coppola, supra; Chadwick, supra. If only federal custody is to be considered, it is evident that Johnson's confession was properly admitted under this section of the statute. We need not, however, reach this question. Assuming that both state and federal custody must be considered, the fact that there was a delay in excess of the limits set out in section 3501(c) does not necessarily require suppression of a confession obtained during that delay. Such a delay is only one factor among at least five stated in section 3501(b) to be considered in determining whether the confession was voluntary and therefore admissible. 18 U.S.C. § 3501(b); Marrero, supra; United States v. Halbert, 436 F.2d 1226 (9th Cir. 1970); Wright, supra, § 74 at 89. As there was no question as to the voluntariness of Johnson's confession under section 3501(b), the confession was properly admitted.

█ Johnson next claims that he was not adequately warned of his constitutional rights prior to confessing. He asserts that the authorities failed to warn him of "his right to break off questioning at any time during the interrogation." (Johnson's Brief, p. 11). The claim is without merit.

Under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before a suspect in custody can be questioned he

"must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444, 86 S.Ct. at 1612.

In the instant case, prior to making his confession to the state police officers, Johnson was twice warned of each one of these rights; first an officer told him of these rights and then Johnson read them aloud from a poster in the police station and stated that he understood each one. At no time during the questioning which immediately followed did Johnson indicate any desire to terminate the interrogation. See, Collins, supra; Miranda, supra at 473–474, 86 S. Ct. 1602. Subsequently, prior to repeating his confession to the federal agents, Johnson was again twice warned of each one of these rights; first an agent orally explained them to him and then he signed a waiver form. As in the prior interview, at no time was there any intimation that he wished the questioning to cease. Under these circumstances, we find that Johnson was adequately warned of his Miranda rights. See, United States v. Vanterpool, 394 F.2d 697 (2d Cir. 1968).

█ Johnson's final contention is that he was entitled to the presence of an attorney at a pre-trial photographic identification. As no authority is cited in support of his position and no arguments are advanced as to why we should reconsider a position which has been rejected many times before, see, e. g., United States v. Bennett, 409 F.2d 888 (2d Cir.), cert. denied, Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969); United States ex rel. Johnson v. Dept. of Correctional Services, 461 F.2d 956, 959–960 (2d Cir. 1972), the contention can be dismissed as being without merit.

█ Turning to Rufus Higley's first contention, it is argued that the items seized at his apartment (the hacksaw, the shotgun shell, his coat and part of a

sawed-off shotgun), were the product of a search in violation of the Fourth Amendment. Conceded is the fact that the police had a right to enter the apartment and to go upstairs to search for other armed suspects that might be at large. Also conceded is the right of the police to seize any weapons found while searching for suspects. It is claimed, however, that the scope of this permissible search was exceeded when the officers opened a closet door and examined the contents of a bag on a shelf and the pockets of a coat. We disagree.

The answer to Higley's contention is found in Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). There the police, in "hot pursuit" of at least one armed suspect, entered a house where they had reason to believe he was hiding. Spreading out through the house, some of the officers arrested the suspect in an upstairs bedroom. Meanwhile, one officer discovered a shotgun and a pistol in a flush tank in an upstairs bathroom and another found a jacket and trousers of the type the fleeing man was said to have worn in a washing machine in the cellar. In addition, a clip of ammunition for the pistol and a cap were found under the suspect's mattress and ammunition for the shotgun was found in a bureau in the suspect's room. In holding all these items of evidence admissible, the Court stated that the police

"acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured

that Hayden [the suspect] was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." 387 U.S. at 298–299, 87 S.Ct. at 1646.

It is evident that both the facts of Warden, Md. Penitentiary v. Hayden and its rationale refute Higley's contention. In the instant case, as in Warden, Md. Penitentiary v. Hayden, the police were properly in an upstairs bedroom searching for weapons and other armed suspects. As part of this search, opening a closet door in the room was not only reasonable but virtually required to insure the safety of the officers. Upon noticing a "grip" of what appeared to be a weapon, the police officer properly examined the bag from which the "grip" was protruding. Similarly reasonable was the search of the coat which the suspect was known to wear for weapons and its seizure once a shotgun shell was found in a pocket. To have not acted in this manner would have "gravely endanger[ed] their lives or the lives of others." All the items were properly admitted.

■ Higley's remaining argument is that a suitcase belonging to White, and its contents, found at the rear of an apartment building shortly after White was arrested in one of the apartments should not have been admitted in evidence against him.[7] White also advances this argument. We are unpersuaded.

White was arrested at 9:45 A.M. after an informant, whose reliability is not challenged, advised the police where he could be found. After White was removed to the police station, the informant again telephoned to notify the police that two suitcases belonging to White could be found near the rear door of the apartment building. The informant also stated that one of the suitcas-

7. Because we find this contention to be without merit we need not determine whether Higley has standing to raise this issue on appeal. *See*, McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

es contained a shotgun. As the apartment was known to be located in a transient and high crime area and as the police also knew that the suitcases were probably visible to passers-by, police officers, without a warrant, rushed to the apartment building. The suitcases were found exactly where the informant said they would be. As the officers approached the suitcases, they knew that one probably contained a sawed-off shotgun. This knowledge was based not only upon the statements of the informant, but upon the fact that a sawed-off shotgun was used in the robbery in which White was implicated, that it had not yet been located and that one of the robbery suspects was suffering from a gunshot wound. With this knowledge, the officers opened the suitcases and discovered a loaded sawed-off shotgun. The question is whether the actions of the police were in violation of the Fourth Amendment.

We find little difficulty in concluding that the officers were justified in seizing the closed suitcases. It was not practical to secure a warrant because the suitcases could have been removed from their position outside the apartment building at any moment. The suitcases in this situation were similar to mobile automobiles. *See*, Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). It was therefore likely that the opportunity to seize the suitcases would have passed if the officers had waited to secure a warrant. *See*, Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Of more difficulty is the question of whether the officers properly opened the suitcases after seizing them.

Upon due consideration, we find that in opening the suitcases, the police were not acting in violation of the Fourth Amendment. The "exigencies of the situation made that course imperative." McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). The officers were holding a suitcase which they had probable cause to believe contained a contraband sawed-off shotgun. There was a substantial possibility the gun was loaded. As they stood in that transient and high crime area, their own safety and the safety of others required that they know whether they were holding a dangerous weapon over which they had no control. *Cf.*, Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Under these circumstances, we cannot hold that the police were required to carry the suitcase, unopened, to the police station to obtain a warrant or that an officer should have stood near or held the unopened suitcase as a warrant was obtained. The police were entitled to know what they were holding in their possession. The suitcase containing the shotgun and its contents were properly admitted.[8]

 A final contention advanced by White is that it was error not to order the disclosure of the identity of the informant who advised the police where his suitcase could be found. According to White, since the informant supplied the core or main bulk of probable cause for the warrantless search, disclosure was mandatory. We disagree.

It should first be noted that the motion for disclosure was not made until the third day of trial, after the motion to suppress the contents of the suitcase

---

8. Since we find the seizure and search of the suitcase justified on the above explained rationales we need not determine what general standard is to be applied to the search and seizure of suitcases. *See*, Coolidge v. New Hampshire, 403 U.S. 443, 461 n. 18, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) and compare with *Chambers, supra*; *see also*, United States v. Maynard, 439 F.2d 1086 (9th Cir. 1971) and

United States v. Mehciz, 437 F.2d 145 (9th Cir.), cert. denied, 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971), and compare with United States v. Colbert, 454 F.2d 801 (5th Cir. 1972), which, according to the Government's Brief, p. 18 n. 9, the Fifth Circuit has on its own motion decided to re-consider *en banc*.

had been denied. While the appellant certainly had the right to request disclosure at the suppression hearing, Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1938), this right does not necessarily exist throughout the course of the trial. United States v. Volkell, 251 F.2d 333, 336 (2d Cir.), cert. denied, 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1068 (1958); Bennett, supra, 409 F.2d at 901. Here, where the accused was aware of all the relevant facts at the time the motion to suppress was heard, F.R.Cr.P. 41(e) would have permitted a denial of the motion to disclose insofar as disclosure was relevant to the issue of probable cause.

In any event, the trial judge properly ruled that White was not entitled to disclosure on the merits. Disclosure is required when the accuracy of the informer's information is in doubt and the information was the " 'essence or core or main bulk' of the evidence brought forth which would otherwise establish probable cause." United States v. Tucker, 380 F.2d 206, 212 (2d Cir. 1967); United States v. Comissiong, 429 F.2d 834 (2d Cir. 1970). Here, the reliability of the informer is conceded. (White's Brief, p. 18). In addition, White does not question the fact that the police had probable cause to conduct the search. Apparently, the sole justification for the requested disclosure was the desire to learn the identity of the informant who knew where the suitcase could be found and what was in it even though he was in no way involved in the bank robbery. Under these circumstances, the motion was properly denied.[9]

The judgments of conviction are affirmed.

J. JOSEPH SMITH, Circuit Judge (concurring in part and dissenting in part):

I concur in the affirmance of the conviction of Johnson and Higley and dissent from the affirmance of the conviction of White. The evidence as to the contents of the suitcase should have been suppressed as to White as the product of an illegal search. There was no such overwhelming proof as to White on any count aside from the fruits of the search that we can say beyond a reasonable doubt that the fruits played no part in his conviction.

Extending the Carroll motor vehicle doctrine to suitcases or similar objects is not justified, especially where, as in this case, there was no difficulty in either posting a watch over the suitcase or transporting it less than three blocks to the police station until a showing of probable cause could be made before a magistrate. See Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971). I would grant a new trial to White.

While Higley and Johnson had no standing to object, Fed.R.Crim.P. 41(e), United States v. Bozza, 365 F.2d 206, 222–223 (2d Cir. 1966) and see Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), affirming United States ex rel. DeForte v. Mancusi, 379 F.2d 897 (2d Cir. 1967); Combs v. United States, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972), and as to Johnson in any case in the light of his confessions any error in admission might well be harmless, the search was directed at White, in whose recent possession the suitcase had been. He had standing to raise the objection that no exigent circumstances required invasion of his rights by search without determination of probable cause by an impartial

---

9. White also contends that the informant's identity should have been disclosed because it was vital to his defense. See, Roviaro, supra. As there were no facts indicating that the informant was in any way involved in the bank robbery or that he could provide any information relevant to the defense, the contention is frivolous and merits no further discussion.

magistrate, not only on the possession count, but also on the robbery counts.

There is no merit in the claim of abandonment. The suitcases appeared outside the rear door sometime after White's arrest, so that White could not himself have put them there. There was no proof and no likelihood that he had authorized anyone else to do so. And if any inference of abandonment is relied on, disclosure of the identity of the informant, who alone was shown to have any knowledge of the suitcases, should have been revealed. The police tip was that there was a shotgun in the suitcase, not a bomb. So long as the case was in police custody there was no danger from the shotgun. The Fourth Amendment should not be ignored by indiscriminate searches without warrant even in so-called "high crime" areas.

TIMBERS, Circuit Judge (concurring):

I agree with the judgment of the Court affirming the convictions of all appellants on all counts, and I concur in all respects in the able majority opinion of Judge Moore.

Since Judge Smith's dissent is addressed only to the conviction of White on the ground that the contents of the suitcase should have been suppressed as to White as the product of an illegal search, I wish to add the following brief observation on that issue, in addition to my complete concurrence in the majority opinion's treatment of that issue.

Assuming arguendo that the contents of the suitcase were improperly admitted as against White, I am convinced that the admission of such evidence was harmless in view of the other substantial evidence implicating White. For example, there was the testimony of Jacqueline and Alethea Higley as to pre-robbery meetings; the testimony of Bordeaux that he saw White and Johnson together at Higley's apartment immediately after the robbery; the "bait money" found on Johnson; the weapons in Higley's apartment; and, of critical importance, the inculpatory statements of White himself. Such independent evidence of White's guilt, in my opinion, demonstrates beyond a reasonable doubt that the admission of the contents of the suitcase against White, if error at all, was harmless.