## POLDO v. UNITED STATES.
### No. 6403.

Circuit Court of Appeals, Ninth Circuit.

Feb. 1, 1932.

Stanley Burke, of San Francisco, Cal., for appellant.

Geo. J. Hatfield, U. S. Atty., and Herman A. Van Der Zee, Asst. U. S. Atty., both of San Francisco, Cal.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

SAWTELLE, Circuit Judge.

This appeal involves the single question of the legality of the arrest and search whereby certain evidence of the crime charged was secured by the arresting officers.

On April 18, 1930, two secret service officers observed the appellant, hereinafter re-

ferred to as defendant, enter a hardware store, carrying in his hand what appeared to be a metal disc with a piece of tin around it, "such [a disc] as is used in making the reeding or knurled edge on counterfeit silver dollars." Defendant was followed to a garage built in a dwelling house, and was observed to enter with the article mentioned.

On May 2, 1930, Philip E. Geauque, one of the secret service agents, made an affidavit setting forth the above facts. Reciting this affidavit and an oral examination of the affiant as its basis, a search warrant was issued authorizing the seizure of the alleged contraband in the garage, as described in the affidavit. The warrant was issued on the same day as that on which the affidavit was sworn out.

On the following morning, Agent Geauque, Charles B. Rich, another secret service officer, and George H. Richards, a police lieutenant, arrested Poldo in the garage. According to Geauque's testimony at the trial, the following search then took place: "The entrance way to the garage led us to a toilet, a small toilet, where part of the wall had been knocked out, and there was a door leading from the toilet into this garage, and that door was open. Another door led from the toilet into the interior of that part of the house, but that door was locked and Mr. Poldo opened that with a key which he had taken from his pocket. That door led into a vacant room that he was apparently using as a storeroom, with a lot of boxes and stuff in it, and there was another door that led to the rear, which he tried to open with a key, but was apparently unsuccessful in his efforts, because finally Lieutenant Richards asked him if he was using the right key and it developed he was not using the right key, but that the right key was on a ring which he took from his pocket, and Lieutenant Richards found it and opened the door which led into a kitchen where there was a sink and a gas stove and a table and some chairs, and also into another room, apparently a bedroom, with a bed and two chairs in it. * * *"

It thus appears that the search of the garage failed to disclose the metal disc, if such it was, and that the search was extended to defendant's private residence. Therein was found a mold of the metal disc and other contraband.

On cross-examination, Agent Geauque, referring to his observation of the defendant on April 18, 1930, while the latter was carrying the suspicious disc, said: "I saw the defendant carrying a piece of apparatus—it looked like a metal disc."

Agent Arch A. Strange, the other secret service officer who was with Geauque when the defendant was being observed on April 18, 1930, thus described the disc, on direct examination: "Agent Geauque and myself saw Poldo enter store and in his hand he had what appeared to be a metal disc with a piece of tin about one inch wide around it * * * the disc *might* be a mold frame or metal mold—*at that time I was not close enough to see it, just exactly what it was*—I have seen metal molds, it was the shape of one—I have not seen all of it since that time, only pieces that *might* have been part of the part around the edge of it. * * *" (Italics our own.)

On cross-examination, Strange said: "The metal disc could be used for making counterfeit plaster molds,—I refer to the entire piece of apparatus—it could be used as a frame, but *I didn't see the disc close enough to tell exactly what it was at that time*—since then we have found what I believe to be a mold in plaster of the disc I saw—*I could not say it was what is known as a knurling collar—I could not say what the piece of apparatus was*—after Poldo left the hardware store I entered—Agent Geauque remained in the automobile—*Poldo, as he was entering the store, was as close as possibly ten feet to me—I could not tell what piece of apparatus he possessed.*" (Italics our own.)

Agent Geauque, who, it will be remembered, made the affidavit upon which the search warrant was based, remained in the automobile while Poldo was leaving the store, according to Strange's testimony, and therefore may be presumed to have been farther from the defendant than was Strange, who passed Poldo as the latter was leaving the hardware store. Yet, in his affidavit, Geauque swore positively that the disc was a knurling collar. At the trial, however, Geauque, like Strange, was not so sure:

"He carried round metal apparatus of some sort in his right hand—it was of the general character or appearance of counterfeiting apparatus. * * *

"I saw the defendant carrying a piece of apparatus—it looked like a metal disc."

The defendant offered no testimony, and was found guilty of making and possessing a plaster mold for the coining of counterfeit silver dollars. From a judgment of conviction, he appeals.

■ The affidavit of Geauque does not disclose the date on which his observations were made. Time of the affidavit's observations, which are set forth as constituting probable cause that a crime has been committed, is of the essence of the affidavit. Dandrea v. United States (C. C. A. 8) 7 F.(2d) 861, 864. In Kohler v. United States (C. C. A.) 9 F.(2d) 23, 25, this court said: "In this matter the commissioner was not called as a witness, nor was any record of his official acts produced; so that, except for the testimony of Donnelly that before he issued the warrant the commissioner considered the affidavits of the women, there is nothing whatever to negative the statement in the warrant itself that from the examination and facts set out in the affidavit of Donnelly he was satisfied of the existence of the grounds of and upon which the application was based, and that there was probable cause. *The defects in Donnelly's affidavit are glaring. The spaces for the day and the month are not filled in. * * * "* (Italics our own.)

In Staker v. United States (C. C. A. 6) 5 F.(2d) 312, 314, the court used the following emphatic language:

"Furthermore, *although in fact the affidavit was made immediately after the facts were discovered,* the affidavit itself is silent as to the time element. So far as the affidavit shows, the officer might have smelled the fumes months before the affidavit was made. See Rupinski v. United States, 4 F.(2d) 17 (C. C. A. 6), February 4, 1925." (Italics our own.)

See, also, United States v. Baumert et al. (D. C.) 179 F. 735, 740; United States v. Casino (D. C.) 286 F. 976, 978; Lawson et al. v. United States (C. C. A. 7) 9 F.(2d) 746, 748; Siden v. United States (C. C. A.) 9 F.(2d) 241, 243; Blakemore on Prohibition, § 835.

Nor does the statement in the warrant in the instant case, to the effect that the commissioner examined the affiant orally cure the lack of time specification in the affidavit itself.

■ The authorities are clear that the affidavit must be self-sufficient, and cannot be bolstered up by oral testimony. In United States v. Casino, supra, Judge Learned Hand said: "For a similar reason it is not material that the other evidence is absent, which was before the commissioner and which may have induced him to deny quashal of the warrant. While under section 16 he must decide after hearing whether on all the facts there were reasonable grounds for the warrant, that does not dispense with *the necessity for allegations in the affidavits themselves, which, if true, show a self-subsisting ground for the issuance of the warrant.* * * .* In this respect the affidavits are like pleadings. Other corroborative evidence, no doubt, is admissible for the United States, but the original allegations must in the end be supported. Hence, if those allegations on their face be inadequate, the warrant can by no possibility be legal." (Italics our own.)

See, also, Blakemore on Prohibition, § 825. While in the Casino Case the court had before it proceedings before the commissioner to quash the warrant, the principle is equally applicable when the proceedings are first brought before the District Court.

■ Assuming, however, that the search warrant was sufficient in law to authorize a search of "the garage in the basement of a house at 439 Plymouth Street," it was not sufficient to justify an exploratory search that carried the officers to a bedroom and kitchen that "were directly in the rear of the store facing on Plymouth Avenue, over which appear the numerals 437."

The Supreme Court has repeatedly frowned upon exploratory searches. In Go-Bart Importing Company et al. v. United States, 282 U. S. 344, 357, 51 S. Ct. 153, 158, 75 L. Ed. 374, it was said:

"This [second clause of the Fourth Amendment] prevents the issue of warrants on loose, vague or doubtful bases of fact. It emphasizes the purpose to protect against all general searches. Since before the creation of our government, such searches have been deemed obnoxious to fundamental principles of liberty. They are denounced in the constitutions or statutes of every State in the Union. Agnello v. United States, 269 U. S. 20, 33, 46 S. Ct. 4, 70 L. Ed. 145, 51 A. L. R. 409. The need of protection against them is attested alike by history and present conditions. The Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted. Boyd v. United States, 116 U. S. 616, 623, 6 S. Ct. 524, 29 L. Ed. 746; Weeks v. United States, supra, pages 389–392 of 232 U. S., 34 S. Ct. 341 [58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177].

"There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances."

See, also, Marron v. United States, 275 U. S. 192, 195, 48 S. Ct. 74, 72 L. Ed. 231;

Federal Trade Commission v. American Tobacco Company, 264 U. S. 298, 305, 306, 44 S. Ct. 336, 68 L. Ed. 696, 32 A. L. R. 786; Cornelius, "Search and Seizure," § 135.

In the instant case, the government admits, in its brief, that the garage was "built in a dwelling house."

Finally, the government contends that, even if the search was not proper under the search warrant, it was permissible as being "incidental to arrest." Without pausing to inquire whether, even under a lawful arrest, a search of that nature could be allowed, we will proceed to a consideration of the broader question of whether or not the arrest in the instant case was valid. If it was not valid, clearly it would not support the subsequent search.

■■ The general rule as to an officer's power to arrest without a warrant was clearly stated by the Supreme Court in Carroll et al. v. United States, 267 U. S. 132, 156, 157, 45 S. Ct. 280, 286, 69 L. Ed. 543, 39 A. L. R. 790: "The usual rule is that a police officer may arrest without warrant one believed by the officer upon *reasonable cause* to have been guilty of a felony, and that he may only arrest without a warrant one guilty of a misdemeanor if committed in his presence." (Italics our own.)

See, also, Kurtz v. Moffitt and another, 115 U. S. 487, 498, 499, 6 S. Ct. 148, 29 L. Ed. 458.

■ It therefore becomes necessary to inquire whether or not the secret service agents had reasonable cause to believe that a crime had been committed, either in their presence or otherwise.

We have already set forth at some length the officers' testimony at the trial. This testimony fails to disclose with reasonable clearness what the defendant had in his possession on the occasion when he was observed, or that the article so possessed was contraband and could be recognized as such; but it does disclose that the officers were in a state of doubt and did not then believe that an offense had been committed, hence made no arrest.

In Stacey v. Emery, 97 U. S. 642, 645, 24 L. Ed. 1035, the Supreme Court thus defined "probable cause": "If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offence has been committed, it is sufficient." See, also, other cases quoted or cited in Carroll v. United States,

supra, at pages 161, 162 of 267 U. S., 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790.

And as pointed out in Lawson et al. v. United States, supra: "This probable cause must be determined by the existence of facts known to the officer *before, not after,* the search." (Italics our own.)

Though in these cases seizures without search warrants, and not arrests, were involved, the doctrine is identical. In Baumboy v. United States (C. C. A.) 24 F.(2d) 512, 513, however, both arrest and seizure were considered by this court, Judge Dietrich saying: "For defendant in error it is urged that the seizure may be justified as an incident of the arrest, but the arrest was, to say the least, no more defensible than the search."

We believe that a study of the evidence of appellant's guilt before the officers at the time they made the arrest will disclose that it was insufficient to establish probable cause that he had committed the crime. Mere suspicion is not enough; there must be circumstances represented to the officers through the testimony of their senses sufficient to justify them in a good-faith belief that the defendant had violated the law.

"While an officer may arrest without warrant for reasonable cause, *he can only act upon evidence.*" Brown v. United States (C. C. A. 9) 4 F.(2d) 246, 247. (Italics our own.)

Furthermore, two weeks had elapsed since they had first observed him. The affidavit of Geauque shows that they knew the suspect's name and address. In this case there was no emergency, such as that presented by a moving vehicle suspected of carrying contraband. As was said by the Supreme Court in the Go-Bart Case, supra: "Notwithstanding he had an abundance of information and time to swear out a valid warrant, he failed to do so."

In Wharton's Criminal Procedure (10th Ed.) section 36, pages 74, 75, we find the following pertinent language: "In those cases where the offense is past, the rule is different and an officer may not apprehend the offender without a warrant, except in outrageous crimes of the felony type. In the cases of such crimes, however, *it is the duty of the officer to begin immediately after notice* the pursuit of the person charged with the offense, provided only that there be at the time reasonable ground of suspicion." (Italics our own.)

Nothing occurred between the time Poldo

was observed entering the garage and the time of his arrest, fifteen days later, which enhanced the probability of the cause for believing that he had committed a crime.

Indeed, every day's delay that proved unproductive of additional evidence for suspecting Poldo measurably diminished the reasonableness of arresting him a fortnight later. The officers were endeavoring to secure additional evidence against the suspect. This fact, of itself, would tend to indicate that they were not at all sure that they had probable cause to arrest him merely upon what they first saw. And they saw nothing else until after. they made the arrest and search.

To justify the search of a man's home as an incident to an arrest made upon a cause so lacking in probability would, we believe, result in at least a partial nullification of the Fourth Amendment. Such an arrest would not be in keeping with the letter or the spirit of the amendment, or of the Supreme Court decisions interpreting it.

Judgment reversed.