UNITED STATES of America, Plaintiff,

v.

Michael Lee MUSICK, Defendant.

No. CR–80–0328 RFP.

United States District Court,
N. D. California.

Jan. 21, 1982.

the "customary fees in the community". All together, the sum granted is a reasonable one.

Dennis Aftergut, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

Charles Gretsch, San Francisco, Cal., for defendant.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

The defendant, Michael Musick, was indicted on six counts of an eight-count indictment handed down on August 12, 1980. Counts One, Two, and Three charge defendant with possession and distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Counts Four, Five, and Six charge defendant with the possession of various firearms in violation of 18 U.S.C. § 924(c)(2), 26 U.S.C. § 5861(d), and 18 U.S.C.App. § 1202(a)(1), respectively. Defendant has moved pretrial to suppress various items seized by the police which are to be used as evidence in his trial. The defendant claims the searches which produced the relevant evidence were all conducted in violation of the fourth amendment.

Although the defendant refers to four distinct searches, or groups of searches, the government has stipulated that it will not introduce as evidence any items seized dur-

ing two of these searches. Consequently, we shall consider the lawfulness of the remaining two searches only. The first is the search of defendant's automobile which took place on February 2, 1978. The other search is actually a series of four searches which took place at or around the defendant's residence on June 2 and 4, 1978.

## INTRODUCTION: PREVIOUS RULINGS

Defendant was one of numerous co-defendants in the case of *United States v. Barger, et al.*, No. CR–79–0226 SC, which is more commonly known as the first "Hell's Angels" conspiracy trial. *Barger* ended in a mistrial, as did the retrial. Thereafter, the government severed many of the defendants and brought a number of smaller, more manageable actions in the federal district courts, the instant case among them.

During the original "Hell's Angels" trial, the defendant moved to suppress the same items he seeks to suppress in this case. The district court judge in *Barger* denied defendant's motion and held the two searches at issue herein to have been lawful. Therefore, we must examine whether this court is bound by the rulings in the earlier trial under the doctrine known as "the law of the case." When a federal court enunciates a rule of law to be applied in a pending case, as a general proposition it establishes the law which it itself will apply to the same issues in subsequent proceedings in that case. 1B Moore's *Federal Practice*, ¶ 0.404[1], pp. 402–03 (2d ed. 1974). This doctrine is said to be mandated by public policies favoring stability and certainty of the law and the termination of litigation within a reasonable time. *Kimball v. Callahan*, 590 F.2d 768, 771 (9th Cir. 1979), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979).

It is true that the law of the case is not properly invoked where the case is not the same. *Fidelity & Deposit Co. of Maryland v. Port of Seattle*, 106 F.2d 777 (9th Cir. 1939), *cert. denied*, 309 U.S. 661, 60 S.Ct. 515, 84 L.Ed. 1009 (1940); 1B Moore's *Federal Practice*, ¶ 0.404[1], pp. 402–04.

Nevertheless, the general rule is that a decision in one case is controlling as the law of the case in a related action if it involves the same subject matter and if the points of decision and facts are identical. 21 C.J.S. Courts § 195, p. 340.

■ The case before us is, of course, a direct off-shoot of the *Barger* case in which the first judge made his rulings. In both cases the plaintiff was the United States and the defendant was Michael Musick. In both cases, the subject matter of the motion was the same and the arguments presented to the court were the same. Accordingly, the first judge's orders should, in general, be binding in the case before us. However, the law of the case should be departed from if the original ruling is clear error or a higher court has made a contrary ruling applicable to the issue. *Kimball v. Callahan, supra,* 590 F.2d at 771–72. For the reasons outlined below, we hold that both of the searches at issue must be reconsidered.

## I. THE AUTOMOBILE SEARCH

On the night of February 1, 1978, officers of the San Leandro (California) Police Department ("SLPD") were conducting a "stake-out" at the Islander Motel in San Leandro. The officers had received information leading them to believe that a fugitive they were seeking might appear there that evening. While conducting the stake-out at the motel, which was known to the SLPD as a place frequented by drug traffickers, the officers noticed activity which led them to believe drug transactions were taking place. Three drug-related arrests were made between the hours of 8:00 p. m., February 1, and 1:00 a. m., February 2. A 1968 Buick Riviera which was in the motel parking lot was discovered to be registered to one Richard Motley, a person with an arrest record with which one of the investigating officers, Detective Meenderink, was familiar. Detective Meenderink had previously talked with Motley's probation officer regarding Motley's probationary status for narcotics-related offenses. Consequently, Meenderink was aware that a condition of Motley's probation required that his person,

his residence, and his vehicle be subject to search without a warrant at any time by a peace officer.

Upon leaving the stake-out around 1:00 a. m. on the morning of February 2, Detective Meenderink met with Patrol Officer Bernard, who patrolled the area of the motel, and informed him that the 1968 Buick Riviera was registered to Motley, that Motley was probably armed, and that Bernard should stop the car if he should see it leave the motel.

Sometime between 5:30 and 6:00 a. m. that morning, as Officer Bernard was passing by the Islander Motel, he observed the Riviera exit the motel driveway. The officer stated that he stopped the car because of (1) erratic driving indicative of intoxication on the part of the driver, and (2) the request made by Detective Meenderink to stop the car if it attempted to leave the motel premises.

Officer Bernard did not know either Richard Motley or the defendant Michael Musick by sight. The officer requested the driver of the car to produce his driver's license and registration certificate for the automobile. The driver remained in the vehicle with the doors locked and the driver's side window rolled down approximately one to two inches—just enough to hand the officer the requested documents. The driver's license was in the name of Michael Lee Musick. The vehicle registration contained the names of both Michael Musick and Richard Motley.

During the time that Officer Bernard was obtaining this information, he noticed that the defendant appeared highly nervous. The defendant gave the impression that he was purposely avoiding face-to-face contact with the officer. He also appeared to fidget in his seat excessively and, at various times, to move his hands from his waist area to his crotch and then to his side. During this time Bernard was unable to get a full view of the defendant's face to compare it with the photograph on the license nor was he able to make any determination as to the height, weight, or physical identity of the licensee. In addition, Bernard was

informed over his radio that Musick had as a possible alias the name Michael Motley.

The defendant refused to get out of the vehicle upon request or to respond to the officer's inquiries. Bernard again asked the defendant to get out of the car and informed him that if he failed to do so he would be arrested. When the defendant refused to do so, Bernard informed him that he was under arrest for resisting the officer's orders and obstructing justice. Nevertheless, the defendant continued to refuse to get out of the car.

Shortly thereafter, at approximately 6:00 a. m., Detective Meenderink arrived at the scene for the purpose of making a positive identification of the driver. He, too, ordered the defendant to get out of the car. When Musick again refused, Meenderink attempted to smash the driver's side window with his baton. Concluding that the side window was not breaking apart as desired, Meenderink began to smash the front windshield of the car. As the detective was doing so, the defendant laid across the front seat with his head towards the passenger's side of the car.

Less than one minute after Meenderink began his assault on the car's windshields, the defendant apparently changed his mind about resisting arrest. He suddenly got up, unlocked the car door, and got out of the vehicle as though nothing had happened. He was then taken into custody by Meenderink, who immediately pat-searched him. During the pat-down, Meenderink discovered a loaded .22 caliber revolver behind the defendant's belt and a small amount of white powder containing methamphetamine in an aspirin container in one of his pockets.

The search of the automobile had to be postponed because of the presence of a large Doberman Pincer in the back seat. While the police waited for an animal control unit to arrive, Musick complained that he had gotten glass in his eye when the automobile windshields were being smashed. The officers obliged the defendant and took him to a nearby hospital before taking him to the station house. The time was approximately 6:30 a. m.

Sometime between then and the arrival of the animal control unit at 7:00 a. m., Meenderink observed Richard Motley and another person drive by the scene. Motley's car slowed as it passed, but it did not stop and it did not return.

Immediately subsequent to the removal of the dog from the car, the police began to search the vehicle. They found another loaded .22 caliber pistol under the armrest on the front seat. On the floor of the passenger side of the front seat, the police found an unlocked, closed briefcase. Meenderink removed the briefcase from the car and opened it. Inside he found .22 and .45 caliber ammunition, drug paraphernalia, and a large amount of white powder which eventually proved to be 410.4 grams of methamphetamine.

A third officer then searched the trunk of the car and found a small zippered attache case which was padlocked. The officer forced open the lock and opened the case. Inside he found a loaded .45 caliber handgun.

The defendant objects to the admission of all evidence obtained pursuant to this automobile stop and search. We shall address the admissibility of each group of evidence separately.

### A. Preliminary Issues

■ 1. *The investigatory stop.* Defendant objects that, as this was a warrantless stop and search, the evidence found during the pat-down and the subsequent searches is inadmissible. We do not find this to be a troublesome issue. The Supreme Court has interpreted the fourth amendment to permit investigatory stops. The test applied by the courts to determine the validity of the stop is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). This standard is applied by examining whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the

action taken was appropriate." *Id.* at 21–22, 88 S.Ct. at 1879–80.

The officer who made the initial stop of defendant's car claims that the car was being driven erratically and that he suspected the driver to be intoxicated. If true, the officer was permitted to investigate and to cite the driver for violation of appropriate traffic ordinances. It is more likely, however, that the officer stopped defendant's vehicle according to the instruction of Detective Meenderink who was conducting the stake-out at the Islander Motel earlier that morning. As previously noted, the car was registered in the names of both Motley and Musick. Motley was subject to search without a warrant at any time by a peace officer as a condition of his parole on a narcotics conviction. *See People v. Mason,* 5 Cal.3d 759, 97 Cal.Rptr. 302, 488 P.2d 630 (1971), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1289, 31 L.Ed.2d 478 (1972). The car was parked in front of a motel known as a place where drugs are sold and used; indeed, three drug-related arrests had been made during the previous 12 hours. Under these circumstances, it is implausible for defendant to argue that no probable cause existed to stop the Buick Riviera. Indeed, considering Motley's parole condition and the fact that the car was registered to Motley and believed to be driven by him, to argue that the investigatory stop was illegal is nearly fantastic. Therefore, even if we were to disregard the officer's claim that the car driven by the defendant was initially stopped on suspicion of drunk driving, the stop was still legal for the purpose of identifying whether the driver was Richard Motley.

2. *The order to exit from the automobile.* The next question to be dealt with is whether the order to get out of the car, issued after the driver was lawfully detained, was reasonable under the fourth amendment. This inquiry must focus "not on the intrusion resulting from the request to stop the vehicle or from the later 'pat-down,' but on the incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped."

*Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

Following the guidance of the *Mimms* decision, it is clear that the request was permissible in this case. Once a motor vehicle has been lawfully detained, the police may order the driver out of the vehicle without violating the fourth amendment's proscription of unreasonable searches and seizures. *Id.* at 111 & 111 n.6, 98 S.Ct. at 333 & 333 n.6. We need not, therefore, examine whether the officer was reasonable in his belief that the defendant was armed.

B. *The Handgun and Drugs Found on Defendant's Person*

We must now consider the question of the propriety of the pat-down search which produced the loaded handgun and the small amount of methamphetamine. This question also presents us with little difficulty. By the time of the search, defendant had already been placed under arrest. This being so, the police were permitted to conduct a complete search of the defendant. *See United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (search of person of arrestee incident to lawful arrest is traditional exception to warrant requirement of fourth amendment).

Even if the defendant had not yet been placed under arrest, however, the pat-down search was valid under the circumstances of this case. Under the *Terry* standard articulated above, it is clear that the facts available to the officer at the moment of the search and seizure warranted a man of reasonable caution in the belief that the action taken was appropriate. *Terry v. Ohio, supra,* 392 U.S. at 21–22, 88 S.Ct. at 1879–80. At the time of the search, the defendant had refused the orders of two officers to get out of the car. Both officers testified that the defendant acted in a nervous fashion, continually moving his hands from his waist area to the side of the seat. Both expressed their opinion as experienced police officers that the driver was armed. The officers were, therefore, acting reasonably in searching defendant's person.

## C. The Search of the Vehicle

After the defendant had been placed in custody and taken to a hospital and the animal control unit had removed the dog from the backseat of the automobile, the police conducted a thorough search of the Buick Riviera. Defendant objects to the admission of the various pieces of evidence obtained during this search. We shall discuss each item separately.

■ 1. *The gun under the armrest.* The seizure of the gun under the center armrest in the front seat of the car was justified under the "automobile exception" to the fourth amendment search warrant requirement. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The fact that the search occurred after the defendant had been taken into custody and after the police had secured control of the car is not a relevant distinction. *United States v. Mackey*, 626 F.2d 684 (9th Cir. 1980) ("automobile exception" applies even where police have complete and exclusive possession of car).

2. *The unlocked briefcase in the front passenger area.* In *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), a locked footlocker was lawfully seized by federal agents from the open trunk of a parked automobile during the arrests of the footlocker's owners. The search of the locker occurred one and one-half hours after the arrests and was conducted in the federal building by federal agents without a warrant or consent, but with probable cause. The Supreme Court concluded that:

(1) by placing personal effects inside a double locked footlocker, respondents manifested an expectation that the contents would remain free from public examination;

(2) the footlocker search was not justified under the "automobile exception" since a person's expectation of privacy in personal luggage is substantially greater than in an automobile;

(3) the footlocker was under the federal agents' control so no exigencies were present; and

(4) the footlocker search was not a search incident to a lawful arrest.

Based on these findings, the Supreme Court affirmed the lower court's granting of defendant's motion to suppress the marijuana found inside the footlocker.

The Ninth Circuit tried to interpret *Chadwick* in *United States v. Finnegan*, 568 F.2d 637 (9th Cir. 1977). In *Finnegan*, defendant was stopped for speeding. During routine questioning, the patrol officer noticed Finnegan stuff a roll of money into the glove compartment; he also saw a gun case on the floor of the car. The officer arrested Finnegan, examined the gun case and found a gun inside it. He then saw a suitcase in the hatchback of the car. When he opened the suitcase he found a large amount of money inside it.

The Ninth Circuit affirmed the admission of all of the evidence. It concluded that the patrol officer had probable ·cause for the search of the suitcase and also that "the moveable nature of an automobile is an exigent circumstance which justifies a warrantless search if there is probable cause to believe that the auto contains contraband or the instrumentality of a crime. Accordingly, the search of the suitcase was lawful." *Id.* at 640.

A year and one-half later, the Supreme Court ruled that *Chadwick* did not allow warrantless searches of luggage seized from an automobile absent exigent circumstances. *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). The Court implied that "exigent circumstances" were restricted to situations where a police officer is endangered or there is a risk of losing the evidence. *Id.* at 766, 99 S.Ct. at 2594.

The court in *Barger* reviewed these cases and, noting that Musick's arrest occurred after *Finnegan* and before *Sanders*, held *Finnegan* to be controlling in the *Barger* case. Accordingly, it held all evidence obtained during the February 2, 1978, search of Musick's car to be admissible. However, the Ninth Circuit subsequently held that *Sanders* does apply retroactively

to all searches conducted after *Chadwick.* See *United States v. Medina-Verdugo,* 637 U.S. 649, 652 (9th Cir. 1980); *United States v. Stewart,* 650 F.2d 178, 181 (9th Cir. 1981) (interpretation in *Finnegan* that *Chadwick* did not affect automobile search exception to warrant requirement of fourth amendment was incorrect). As *Finnegan* was the linchpin of the court's analysis in *Barger,* the order clearly must be held inapplicable to this case.

The government acknowledges that *Finnegan* is no longer controlling. In the alternative, they now argue that the search of the briefcase found in the passenger area of the automobile was justified because the police had probable cause to believe it contained a loaded firearm. The loaded firearm, they claim, created the exigent circumstances contemplated by the *Sanders* decision. Their argument is predominantly based on a 10-year old Second Circuit case, *United States v. Johnson,* 467 F.2d 630 (2d Cir. 1972), *cert. denied, sub nom. White v. United States,* 410 U.S. 932, 93 S.Ct. 1382, 35 L.Ed.2d 595 (1973), which held admissible a shotgun found during a warrantless search of a suitcase seized pursuant to an informant's tip. The area in which the suitcase was found had been the general hiding area of criminals arrested during the previous few days. The court held that, because the gun was probably loaded, "in that transient and high crime area, [the police officers'] own safety and the safety of others required that they know whether they were holding a dangerous weapon over which they had no control." *Id.* at 639.

We find that *Johnson* is inapposite to this case for at least two reasons. First, the police officers in the *Johnson* case were not in a secured area, and were in a potentially dangerous situation since the tip that led them to the area may have been a ruse. The officers in the instant case, on the other hand, were in complete control of the relevant area. *Johnson* is therefore distinguishable on the facts. Second, it appears that, subsequent to the Supreme Court decisions in *Chadwick* and *Sanders,* the Ninth Circuit has declined to follow the more far-reaching implications of the Second Circuit

decision. We shall discuss the second problem first.

Shortly after the *Sanders* decision was handed down, the Ninth Circuit relied upon that decision in holding evidence inadmissible in *United States v. MacKay,* 606 F.2d 264 (9th Cir. 1979) (per curiam). In *MacKay,* a Drug Control Agent overheard MacKay state that he was an ex-felon and that he possessed a gun in his car. MacKay's car was subsequently placed under surveillance. As he approached his car, agents placed him under arrest, obtained the keys to the trunk of the car and found a suitcase therein. Without obtaining a search warrant, the suitcase was opened, revealing a handgun. The court of appeals held the gun inadmissible on the basis of the paramount privacy interests enunciated in *Sanders* and on the basis of the absence of exigent circumstances. *Id.* at 265–66.

*MacKay* was then cited and relied upon in *United States v. Medina-Verdugo, supra,* to invalidate a similar search where the luggage was suspected of holding contraband. The court stated:

> We think, however, that *United States v. MacKay,* 606 F.2d 264 (9th Cir. 1979) binds us to reject any interpretation of *Sanders* that makes the validity of an automobile luggage search depend upon whether the officers suspect that a particular piece of luggage contains contraband. In *MacKay* officers were informed that an ex-felon possessed a gun somewhere in his automobile. The information is like the general information about the contraband the officers had in this case. Under the rationale in *Sanders,* we invalidated the search of luggage in *MacKay,* and *MacKay* requires us to invalidate the search that occurred here.

*Id.* at 652–53.

Furthermore, the Supreme Court recently reaffirmed the privacy interests associated with closed pieces of luggage in *Robbins v. California,* 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981). *Robbins* is discussed in detail in part I.C.3., *infra,* but at this point it should be noted that the Court there held that

[*Chadwick* and *Sanders*] made clear, if it was not clear before, that a closed piece of luggage found in a lawfully searched car is constitutionally protected to the same extent as are closed pieces of luggage found anywhere else.

453 U.S. at 425, 101 S.Ct. at 2845, 69 L.Ed.2d at 750.

We believe that the *MacKay* and *Medina-Verdugo* cases, as reaffirmed by the Supreme Court's language in *Robbins*, indicate that this circuit had declined to follow exactly the holding of the Second Circuit in *Johnson* which, if taken literally, would allow the warrantless search of luggage whenever the police suspected it to contain a loaded weapon. The government correctly notes that the Supreme Court made passing reference to *Johnson* in a footnote where it stated:

Of course, there may be other justifications for a warrantless search of luggage taken from a suspect at the time of his arrest; for example, if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon. See, e.g., *United States v. Johnson*, 467 F.2d 630, 639 (CA2 1972).

*Chadwick,* 433 U.S. at 15 n.9, 97 S.Ct. at 2485 n.9, 53 L.Ed.2d at 551.

It is clear, however, that by "immediately dangerous instrumentality" the Court in *Chadwick* had in mind weapons that could endanger the health and safety of police officers without the luggage even being opened. If loaded guns were to be distinguished from unloaded guns for the purposes of this fourth amendment inquiry, all a police officer need do whenever he or she suspected seizable luggage to contain a firearm is to specify that it is a loaded weapon which is suspected to be therein, thereby obviating the need for a search warrant.

Such a holding would be contrary to the entire thrust of *Chadwick, Sanders* and *Robbins*, which are all post-*Johnson* decisions. We do not believe that the Supreme Court intended such a fine distinction by the mere citing of *Johnson* in a footnote.

▮ Moreover, the events of the *Johnson* case itself took place in a high crime area over which the police had no control. Conceivably, the inherent dangerousness of the weapon need be less in such a situation than in an area over which the police had control. At least this seems to be contemplated within the definition of "exigent circumstances." In this case, three officers and an animal control unit were present during the search of the automobile. Therefore, the police cannot justify the search on the basis of being present in an area over which they had no control.

The government attempts to refute this conclusion by emphasizing the fact that Musick's cohort, Motley, drove by the scene of the arrest in between the time Musick was taken into custody and the arrival of the animal control unit. We do not believe, based on the testimony of Detective Meenderink, that this event placed the police in a vulnerable situation anything approaching that faced by the police in *Johnson*. There is nothing to indicate that the police were ever in jeopardy or even apprehensive over Motley's brief appearance. Moreover, whatever apprehension that could possibly have arisen was diminished upon the arrival of an animal control unit and the additional protection it afforded. We hold, therefore, that no "exigent circumstances" were present which could justify the warrantless search of the briefcase.

▮ The government also argues, albeit with less conviction, that the search of the briefcase was permissible as incident to a lawful arrest,[1] citing *New York v. Belton,*

---

1. This theory appears to be the true reasoning behind the government's "exigent circumstances" argument discussed immediately above. One of the reasons police officers are allowed to conduct a thorough automobile search at the time of an arrest of a driver or a passenger, *i.e.,* against the possibility of allowing a loaded

"incident to a lawful arrest," is to protect weapon to be within the arrestee's reach. *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). The need for such a search disappears once the arrest has been completed and the arrestee placed in custody. *United States v. Calandrella*, 605 F.2d

453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). In *Belton,* a police officer stopped a car for speeding, smelled marijuana during the routine questioning, and placed the occupants under arrest. After separating the occupants (but while still without back-up help), the officer searched each of them and then the car. In the car he found a jacket, unzipped one of the pockets, and found cocaine. The Supreme Court, in reviewing the motion to suppress the cocaine, distinguished *Chadwick* and *Sanders* stating that "neither of those cases involved an arguably valid search incident to a lawful custodial arrest." *New York v. Belton, supra,* 453 U.S. at 462, 101 S.Ct. at 2865, 69 L.Ed.2d at 776. Instead, the Court held that an officer who has made a lawful arrest of a car's occupant may, as a contemporaneous incident of that arrest, search the passenger compartment of the car and examine the contents of any containers found within that area. Further, "container" was held to denote any object capable of holding another object, including closed or open glove compartments, consoles, or other receptacles, as well as luggage, boxes, bags, and clothing. Such searches are justified, the Court held, because of the danger their contents might pose to the police in the course of the arrest.

Based on *Belton,* then, the search of the briefcase in this case would have been valid, except for one insurmountable problem: the search was *not* contemporaneous with the custodial arrest. As noted above, at the time of the car search the defendant was already in a nearby hospital receiving treatment for glass cuts to his face. The car search had to await the arrival of the animal control unit and the removal of the Doberman Pincer. The Court in *Chadwick* held that

> Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive con-

trol, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

433 U.S. at 15, 97 S.Ct. at 2485, relying on *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964).

It is true that the delay in the search of the car was not the fault of the police. Had they been able to proceed as they wished, the search of the briefcase may have been valid under the reasoning of *Belton.* Nevertheless, it appears that the search was not contemporaneous with the custodial arrest and therefore not "incident to a lawful arrest" and therefore not valid without a warrant under the reasoning of *Preston, Chadwick,* and a host of circuit decisions. *See, e.g., United States v. Matthews,* 615 F.2d 1279, 1287 (10th Cir. 1980); *United States v. Calandrella,* 605 F.2d 236, 249 (6th Cir. 1979), *cert. denied, sub nom. Kaye v. United States,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979) (warrantless searches of luggage seized during arrest unlawful if remote in time or place from arrest, or no exigency exists); *United States v. Garcia,* 605 F.2d 349, 354 (7th Cir. 1979), *cert. denied,* 446 U.S. 984, 100 S.Ct. 2966, 64 L.Ed.2d 841 (1980) (warrantless search of luggage within 15 seconds of arrest lawful).

For the foregoing reasons, we hold that the automobile search took place subsequent to the lawful arrest of the defendant at a time when the police were in complete control of the car and no exigent circumstances were present. Accordingly, the search of the briefcase was unlawful because of the privacy interests associated with such containers, *see Robbins v. California, supra,* and *Belton* is therefore inapplicable.

 3. *The locked attache case in the trunk.* The warrantless search of the zip-

---

236, 249 (6th Cir. 1979), *cert. denied, sub nom. Kaye v. United States,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). The government seeks to avoid this conclusion by arguing that the possibility that a loaded weapon is con-

tained within seized luggage in and of itself creates exigent circumstances which would allow a warrantless search. We decline to accept this reasoning.

pered and locked attache case which was found during the search of the automobile trunk is clearly governed by *Robbins v. California, supra.* The fact situations which form the bases of these two cases are similar. The defendant in both cases was the subject of an investigatory stop after a police officer observed erratic driving. Both were subsequently ordered out of the automobile for exhibiting suspicious behavior.[2] In both, the pat-down search revealed contraband, leading to an arrest. And in both, after the defendant was placed in custody, the trunk of the vehicle was searched and a container found. In *Robbins*, the police found two packages wrapped in green opaque plastic. The police unwrapped the packages and discovered marijuana bricks. In the instant case, a locked attache case was forced open, revealing a loaded gun.

As stated in part I.C.2, *supra*, the *Robbins* decision was a reaffirmation of the holdings in *Chadwick* and *Sanders* to the effect that closed pieces of luggage are protected from warrantless searches by the fourth amendment in most situations. *Robbins v. California, supra,* 453 U.S. at 424, 101 S.Ct. at 2845, 69 L.Ed.2d at 750. The *Robbins* opinion also explained that protected luggage is defined, not by the construction of the container, but by the "expectation of privacy" which is attached to it. Therefore, even green opaque plastic containers or paper bags may be protected.[3] It can hardly be doubted that a locked attache case found in the trunk of a car has an "expectation of privacy" attached to it. Justice Powell, concurring in the judgment, suggested that *Robbins* establishes a "bright-line" rule which extends the warrant clause of the fourth amendment to every container, the contents of which are not in plain view, found in the trunk of a car (or in any part of a car if not incident to a lawful arrest, *see New York v. Belton, supra* ).

Accordingly, the handgun found during the warrantless search of the locked attache case found in the trunk of Musick's car is inadmissible.

## II. THE SEARCHES AT THE EL PORTAL MOTEL

As discussed in part I, *supra*, the law of the case should apply unless clearly erroneous. The court in *Barger* denied the motion to suppress evidence seized during the June 2 and 4, 1978, searches of the defendant's residence in a ruling from the bench on September 5, 1979. For the reasons noted below, we believe that the rulings in the *Barger* case with respect to these searches must be reconsidered in part.

The El Portal Motel, located at 17130 Foothill Boulevard, Castro Valley, California, is an apartment complex offering rooms by the day, week, or month. It is owned by George Murphy, Sr., and managed by George Murphy, Jr., with the assistance of the defendant. Murphy, Jr. (hereinafter referred to as Murphy), maintains a residence, office, garage, and storage space in a building which fronts Foothill Boulevard and which is separated from the rest of the buildings within the motel complex.

Directly behind Murphy's building, separated by a driveway, is the building containing Apartment # 12, which is rented to the defendant. Apartment # 12 is on the second story of the building. Beneath Apartment # 12 is a large room or cellar which is used as a storage space. That room has one entrance, a door which opens onto the driveway separating Murphy's building and the building containing the defendant's apartment.

On June 2, 1978, deputies of the San Leandro Police Department served a search warrant on Murphy's residence, locating

---

**2.** In *Robbins v. California, supra*, the defendant was ordered out of the automobile on suspicion of driving while intoxicated. In the instant case, the defendant was ordered out of the automobile on suspicion of possession of a firearm.

**3.** If the contents of the containers are in plain view, however, the need for a warrant is obviated. *See Robbins v. California, supra*, 453 U.S. at ——, 101 S.Ct. at 2846, 69 L.Ed.2d at 751.

some methamphetamine and drug packaging material. In the garage area in Murphy's building they also found a .45 caliber pistol, some identification with Musick's picture on it, and some receipt forms in the name of Michael Musick, 17130 Foothill Blvd. # 12, Castro Valley, California. The police arrested Murphy and advised him of his *Miranda* rights—including his right to refuse consent to any further searches. They then determined from Murphy that he was the manager of the motel and the legal occupant of the storage area beneath Apartment # 12. Murphy also told the police that the storage area was rented to Musick, but that he (Murphy) kept personal possessions inside. After the police received oral consent from Murphy to search the storage space beneath Apartment # 12, they were given a key from him and began the search. Approximately two hours after the search, when Murphy was in custody at the Alameda County Sheriff's Office, he reaffirmed his oral consent by signing a written consent-to-search form.

Once inside the storage area, the police found some handguns in a drawer and a handgun with a silencer attached to it inside a locked toolbox which they had forced open. On the basis of the contraband discovered during this first search, the police obtained another search warrant for a more exhaustive search of the same storage area. In the search of the storage space pursuant to the second warrant, the police found firearms, machine tools, ammunition, and other items. Using this evidence, they obtained yet another warrant for the search of the defendant's apartment.

█ Defendant argues that the first warrant issued upon a fatally defective affidavit. The affidavit stated that the affiant was told by an informant that while he was visiting Murphy, he observed Murphy in the possession of methamphetamine. The affidavit, however, failed to specify the date the observations took place. The only freshly corroborated evidence was that Murphy was present at his residence at the motel on May 25, 1978, the day before the search warrant affidavit was executed.

The judge in *Barger* held that he believed the information given by the informant to the officer who executed the affidavit not to be stale, and that the warrant was therefore valid.

In support of that ruling, *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), made it clear that, while underlying circumstances must be recited, affidavits should be construed in a common-sense manner and doubtful cases should be resolved in favor of the warrant. Nevertheless, subsequent to *Ventresca* at least three circuits have explicitly held that a warrant is fatally defective if the supporting affidavit fails to mention the date upon which the relevant observations were made.

In *Rosencranz v. United States,* 356 F.2d 310, 312 (1st Cir. 1966), the search warrant affidavit contained an averment that the affiant "has reason to believe that on the premises ... there is now being concealed certain property...." The court of appeals in that case reasoned:

> The present tense is suspended in the air; it has no point of reference. It speaks, after all, of the time when an anonymous informant conveyed information to the officer, which could have been a day, a week, or months before the date of the affidavit. To make a double inference, that the undated information speaks as of a date close to that of the affidavit and that therefore the undated observation made on the strength of such information must speak as of an even more recent date would be to open the door to the unsupervised issuance of search warrants on the basis of aging information. Officers with information of questionable recency could escape embarrassment by simply omitting averments as to time, so long as they reported that whatever information they received was stated to be current at that time. Magistrates would have less opportunity to perform their "natural and detached" function. Indeed, if the affidavit in this case be adjudged valid, it is difficult to see how any function but that of a rubber stamp remains for them.

*Id.* at 316, *quoted in United States v. Button,* 653 F.2d 319, 325 (8th Cir. 1981). *See also United States v. Boyd,* 422 F.2d 791 (6th Cir. 1970).

There is no question that the Ninth Circuit law prior to *Ventresca* required the inclusion of the date of observation in the affidavit. In *Kohler v. United States,* 9 F.2d 23 (9th Cir. 1925), the court referred to the failure to fill in the spaces for the day and month of alleged possession and sale of liquor as one of the "glaring" defects in the affidavit. In *Poldo v. United States,* 55 F.2d 866 (9th Cir. 1932), the court, after commenting that the affidavit lacked a date of observation, said, "Time of the affidavit's observations, which are set forth as constituting probable cause that a crime has been committed is of the essence of the affidavit." Since *Ventresca* did not purport to alter the *essential* requirements of a search warrant affidavit, *Poldo* should still apply and the warrant should be held invalid.

The government argues that there is language indicating such dates are non-essential in *United States v. Holliday,* 474 F.2d 320 (10th Cir. 1973). The court there stated that where the undated information is factually interrelated with other, dated information in the affidavit, the inference that the events took place in close proximity to the dates actually given may be permissible. But in *Holliday,* strong corroborative evidence existed *prior* to the issuance of the warrant which evidenced the freshness of the information. In this case, the only corroborative evidence (aside from that which merely corroborated Murphy's presence at the motel) emerged *after* the initial use of the warrant. Accordingly, we hold that the search warrant issued with respect to Murphy's apartment was defective.

The government's supplemental brief, though, claims that even if the original search warrant was defective, the fact that the motel manager gave his consent to the search dissipated any taint. They cite the fact that (1) the police error (the omission of the date of the informant's observation in the affidavit) was minor and not fla-

grant, (2) the oral consent to search was given by the manager of the motel in the manager's home and not in the police station, and (3) the manager was not handcuffed at the time of the consent and was fully informed and fully aware of his *Miranda* rights, including his right to refuse consent to the search. The question before us is whether the impermissible police conduct, *i.e.,* the use of the technically defective search warrant, was sufficiently attenuated from the voluntary consent to search to avoid the exclusion from evidence of the seized items.

Once the defendant has gone forward with some "specific evidence demonstrating taint," such as an illegal search, the burden of proof that the taint was attenuated enough to allow admitting the tainted evidence belongs to the government. *United States v. Taheri,* 648 F.2d 598, 601 (9th Cir. 1981); *United States v. Perez-Esparza,* 609 F.2d 1284, 1290 (9th Cir. 1979); *United States v. Perez-Castro,* 606 F.2d 251, 253 (9th Cir. 1979). Evidence obtained as a result of an illegal arrest, which is not sufficiently attenuated from the arrest to purge it of the taint of the illegal act, must be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *United States v. Humphries,* 636 F.2d 1172 (9th Cir. 1980), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981). Statements should be suppressed as fruits of an illegal arrest if they were not "sufficiently an act of free will to purge the primary taint." *Brown v. Illinois, supra,* 422 U.S. at 602, 95 S.Ct. at 2261, *citing Wong Sun v. United States, supra,* 371 U.S. at 486, 83 S.Ct. at 416.

The question whether inculpatory statements or consents are the products of free will under *Wong Sun* and *Brown* depends upon all of the facts of each case. *Brown v. Illinois, supra,* 422 U.S. at 603, 95 S.Ct. at 2261; *Perez-Castro, supra,* 606 F.2d at 253. *See also, Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (voluntariness is ques-

tion of fact to be determined from all the circumstances). The Court in *Brown* announced three factors for courts to consider, beyond the threshold fifth amendment question of voluntariness, in determining whether a defendant's inculpatory statements subsequent to an illegal arrest must be excluded. These factors are "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct. . . ." *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62, *quoted in Dunaway v. New York*, 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979).

The first two factors go primarily to the question whether an illegally arrested or detained defendant's response to police questioning is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416. The court in *Perez-Esparza* explained that "free will" in this fourth amendment exclusionary rule sense means something apart from "voluntariness," or the absence of coercion, in the fifth amendment sense.

> The "free will" of an inculpating defendant is to be considered in light of the twin policies—deterrence and judicial integrity—of the Fourth Amendment's exclusionary rule. It is not enough for Fourth Amendment attenuation that the statement be uncoerced; the defendant's "free will" must also be sufficient to render inapplicable the deterrence and judicial integrity purposes that justify excluding his statement. In some cases, the intervening, completely self-motivated decision of a putative defendant to inculpate himself is so unforeseeable an event, from the arresting officer's vantage point, that excluding the defendant's statement would serve no deterrent purpose. . . Moreover, where a defendant makes an unconstrained, independent decision to confess or consent, judicial integrity is not compromised by respecting

the defendant's decision to consent to a search or admit his guilt.

609 F.2d at 1289 (citations omitted).

The court in *Perez-Esparza* explained, too, that the third factor, "the purpose or flagrancy of the official misconduct," which the Supreme Court in *Brown* considered "particularly" important, also has its roots in language from *Wong Sun*.

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by *exploitation of that illegality* or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt 221 (1959).

371 U.S. at 487–88, 83 S.Ct. at 417 (*quoted with emphasis added at* 609 F.2d at 1284). It appears that the deterrence rationale for application of the exclusionary rule is especially compelling when police purposely effect an illegal arrest or detention in the hope that custodial interrogation will yield incriminating statements. *See Brown v. Illinois, supra,* 422 U.S. at 600–01, 95 S.Ct. at 2260. *Cf. United States v. O'Looney,* 544 F.2d 385, 390 (9th Cir. 1976), *cert. denied,* 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976) (deterrence rationale not furthered when detention not motivated by improper purposes). Judicial integrity, also, is compromised when evidence which was purposefully acquired through invasions of constitutional rights is used to convict. *Perez-Esparza, supra,* 609 F.2d at 1289.

Returning to the specific issue of Murphy's consent to search the storage area at the El Portal Motel, it will be recalled that the consent was given while Murphy was illegally detained, the search warrant being defective. No intervening circumstances broke the casual connection between the illegal detention and his consent. *See Dunaway v. New York, supra.* Though voluntary, Murphy's decision to consent while in

custody, shortly after his initial arrest, was not an unforeseeable result of his illegal arrest. Thus, the deterrence rationale was not completely vitiated, as in *Wong Sun*, by a lengthy period away from police influences. Nor, for the same reason, can we conclude definitively that Murphy's decision to speak was so independent of police pressure as to absolve the judicial system from the charge of savoring the forbidden fruits of unconstitutional conduct. The first two factors therefore weigh in favor of a finding of no attenuation.

■ The Supreme Court in *Brown*, however, placed the greatest emphasis on the flagrancy of the fourth amendment violation. That factor weighs heavily in favor of a finding of attenuation in the instant case. Murphy was never threatened or abused by the police. No guns were drawn, nor handcuffs used, in the arrest. The oral consent was given in the noncoercive atmosphere of Murphy's own home and was reaffirmed by a written consent two hours later. Moreover, the search would have been totally valid except for the omission of an essential date in the supporting affidavit.

Many Ninth Circuit cases have focused on this most important factor of the *Brown* test and on that basis have held the evidence admissible because of insufficient proof of improper police motives. In *United States v. O'Looney, supra,* for example, the Ninth Circuit examined the three factors enunciated in *Brown* and concluded that because there was a well-founded reasonable suspicion approaching probable cause to believe that O'Looney had committed a crime, and because the illegal detention was noncoercive, they "need not be concerned with deterring purposefully illegal arrests for investigatory or other improper motives." *Id.* at 390. The court in *O'Looney* appeared to be persuaded by the *de minimus* nature of the police violation of the fourth amendment. "Where the fourth amendment violation is less flagrant, a lesser showing is required to purge the later statement of taint." *Id.* The court concluded that it should not invoke the exclu-

sionary rule for a minor deterrent effect on impermissible police behavior, especially where the resulting cost to the legitimate demands of law enforcement are great.

The court of appeals relied on *O'Looney* in *United States v. Wasserteil,* 641 F.2d 704 (9th Cir. 1981). In holding the consent at issue to have been voluntary, the court in *Wasserteil* noted that the defendant was "sophisticated" (by which was presumably meant that he was not easily cowed by detention alone), that he was not handcuffed, and that he was advised of his right to refuse consent. The court also emphasized that the consent was affirmed in writing by the defendant.

We find these cases persuasive in the instant case and, accordingly, find that the motel manager gave his consent voluntarily and of his own free will. While we concede that Murphy's consent followed almost immediately his arrest, we cannot ignore the fact that no improper police purposes whatsoever were present. The three-part *Brown* test for determining voluntariness is still the controlling law in this area. *See Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Nevertheless, it is quite clear that within the test, the "purpose and flagrancy of the official misconduct" factor is to be given the much greater consideration among the three.

Following the instructions of the Supreme Court to consider "all of the circumstances" when determining voluntariness, *see Schneckloth v. Bustamonte, supra,* we note that the search warrant invalidity resulted from a mere oversight. Although sufficient to invalidate the warrant, this factor may be considered when determining the lack of purpose and flagrancy of the misconduct. Moreover, we believe that the total absence of any allegations of coercion surrounding the consent argues in favor of voluntariness. In *Rawlings v. Kentucky, supra,* 448 U.S. at 107–08, 100 S.Ct. at 2562–63, the Supreme Court placed great emphasis on the "congenial atmosphere" in which the defendant's admissions took place. While the atmosphere within the Murphy residence at the time of his arrest and con-

sent may not have been "congenial," we believe that the noncoercive circumstances, when combined with the properness of the police motives in this case, outweighs the short period of time that elapsed between the initiation of the detention and Murphy's consent. *See id.* at 108, 100 S.Ct. at 2563. *See also, United States v. Perez-Esparza, supra,* 609 F.2d at 1290 n.3.

As the motel manager's consent dissipated the taint arising from the defect in the original search warrant, the subsequent search of the storage space beneath Apartment # 12 which resulted from the consent was lawful. In addition, we have reviewed the remaining part of the judge's decision in *Barger* with respect to all subsequent searches at the El Portal Motel and find that it is not clearly erroneous as judged by Supreme Court and Ninth Circuit case law. Accordingly, we shall not disturb that part of the decision, and we decline to reach any further questions in that regard. Therefore, all evidence which was discovered as a direct or indirect result of Murphy's consent is held admissible in Musick's trial.

SO ORDERED.